BARBARA MERENOFF, PLAINTIFF-APPELLANT, v. ALLEN MERENOFF, DEFENDANT-RESPONDENT.

BIENVENIDA MERCADO, PLAINTIFF-APPELLANT, v. SANTOS MERCADO AND WOODALL INDUSTRIES, INC., A CORPORATION IN THE STATE OF OHIO, DEFENDANTS-RESPONDENTS, AND TWO GUYS FROM HARRISON, INC., A CORPORATION IN THE STATE OF NEW JERSEY, DEFENDANT.

Argued April 25, 1977—Decided June 1, 1978.

*Mr. Alfred F. Maurice* argued the cause for appellant Barbara Merenoff (*Messrs. Jesuele and Maurice,* attorneys).

*Mr. Ronald R. Kogos* argued the cause for appellant Bienvenida Mercado (*Messrs. Spevak, Kogos, Coe and Portnoff,* attorneys; *Mr. Steven B. Portnoff,* on the brief).

*Mr. Robert J. Bossolt* argued the cause for respondent Allen Merenoff (*Mr. Fred W. Jung,* attorney; *Mr. Bossolt,* of counsel; *Mr. George Catlett,* of counsel and on the brief).

*Mr. Richard P. Cushing* argued the cause for respondent Santos Mercado (*Messrs. Methfessel and Werbel,* attorneys; *Mr. Cushing,* on the brief).

*Mr. Michael B. Oropollo* argued the cause for respondent Woodall Industries, Inc. (*Messrs. Hoagland, Longo, Oropollo & Moran,* attorneys; *Mr. Donald B. Davidson,* on the brief).

The opinion of the court was delivered by

HANDLER, J. These two cases present the issue of whether the claim of a husband or wife for damages for personal injuries arising from a domestic or household accident attributable to the negligence of the other spouse is barred by the doctrine of interspousal tort immunity. Resolution of this important question requires a decision whether to extend our holding in *Immer v. Risko,* 56 *N. J.* 482 (1970) which abrogated interspousal immunity in automobile negligence suits.

For purposes of the appeals, no essential facts are disputed. In the Merenoff case, Barbara and Allen Merenoff were trimming the bushes in the walkway in front of their house on September 2, 1974. Allen noticed that his wife seemed to be having trouble with a low bush she was trying to trim and he walked over to her, picked up the hedge trimmer and clipped the bush. In so doing, Allen cut off his wife's left index finger at the first phalanx. Barbara commenced a tort action against her husband on April 17, 1975 for the injuries he inflicted. In his answer Allen alleged that plaintiff's injuries were caused by her own negligence and that plaintiff's claim is barred by the doctrine of interspousal immunity. In response to interrogatories, however, he stated that he clipped the bush without giving notice to his wife and before "checking" with her and that his negligence was the sole cause of the accident.

Both Merenoffs are insured under a homeowner's insurance policy which provides for personal liability coverage of

"all sums which the Insured shall become legally obligated to pay as damages because of bodily injury * * * caused by an occurrence." The insurance company is defending in this action. Each party filed a motion for summary judgment and defendant's motion based on interspousal tort immunity was granted. Plaintiff filed a notice of appeal in the Appellate Division and then moved for direct certification pursuant to R. 2:12–2.

In the companion Mercado litigation, according to depositions, on or about October 20, 1972 Santos Mercado bought two one gallon cans of Canolite Contact Cement for the purpose of attaching formica in the kitchen of his apartment. He had never used this cement at any time prior to this accident. A Canolite Contact Cement can has the word "flammable" written on it. Santos was unable to read English; nevertheless, he had had experience as a painter and was accustomed to seeing the word on paint cans and understood its meaning. The next day Santos was using the cement when Bienvenida, his wife, entered the kitchen and stood with her back to a gas stove. Her husband was in front of her spreading glue from the can which was about one and one-half feet from the stove. A flame leapt from the pilot light in the stove, igniting the cement can, a brush and the piece of formica which Santos was holding. Bienvenida, who was in the path of the fire as it shot from the oven toward the glue, was set aflame and burned, severely in some respects, on the left side of her face, left elbow and both legs.

On June 11, 1973 Bienvenida filed a complaint against her husband Santos for her injuries. She later added as defendants Two Guys From Harrison, Inc., Woodall Industries, Inc. and Staley Chemical, respectively, the retailer, manufacturer and distributor of the cement. Santos denied negligence and posed as defenses the negligence of plaintiff and the doctrine of interspousal immunity. A number of cross-claims were filed by defendants. The Mercados have a homeowner's insurance policy in both their names which provides the same

personal liability coverage as the Merenoff policy. The insurance company is defending the action.

Summary judgment was granted in favor of defendant Santos against plaintiff and defendants who cross-claimed against him on the ground that the interspousal immunity doctrine barred such actions. Plaintiff then appealed to the Appellate Division. The trial court's judgment was affirmed on the ground that interspousal immunity continues to apply to a tort action based on "simple domestic negligence." This Court considered plaintiff's petition for certification together with the petition in the Merenoff case and certified both cases. 71 *N. J.* 499; 517 (1976).

I

To set a perspective to the legal issue we address, it is helpful to recapitulate briefly the history and nature of the doctrine of interspousal immunity. That doctrine originated at common law and had its roots in the historical, legal identity of husband and wife as a single, juridical entity. The rigidity and tenacity of the traditional immunity arising from this legal conception of marriage are exemplified by *Phillips v. Barnet,* 1 *Q. B. D.* 436 (1876), first followed in this country by *Abbott v. Abbott,* 67 *Me.* 304 (Sup. Jud. Ct. 1877), which ruled categorically that "[t]he legal character of an act of violence by husband upon wife and of the consequences that flow from it, is fixed by the [marital] condition of the parties at the time the act is done." *Abbott v. Abbott, supra,* 67 *Me.* at 306. The legal incidents and characteristics of marriage at common law, "some substantive, some procedural, some conceptual" were in effect hybridized into an absolute bar "* * * for one spouse ever to be held civilly liable as a tortfeasor, in any situation and without exception, to the other for any act, antenuptial or during marriage, causing personal injury which would have been a tort but for the marriage." McCurdy, "Personal Injury Torts Between Spouses," 4 *Vill. L. Rev.* 303, 307 (1959). See also

1 *Blackstone, Commentaries** 442; McCurdy, "Torts Between Persons in Domestic Relation," 43 *Harv. L. Rev.* 1030, 1031–1035 (1930); *Harper & James, The Law of Torts* 643 (1956); *Prosser, Law of Torts* 859–860 (4th ed. 1971); *Hudson v. Gas Consumers' Association,* 123 *N. J. L.* 252, 253 (E. & A. 1934); *Bendler v. Bendler,* 3 *N. J.* 161, 173–174 (1949) (Ackerson, J., dissenting).

For more than a century, starting about 1844, Married Women's Acts so-called were enacted in every American jurisdiction. The intended effect of these statutes was to give married women a separate legal identity. They purported to confer upon women separate ownership and control of their own property, including choses in action. Women became separately responsible for their torts and were given the capacity to sue or be sued without joinder of the husband. *Prosser, supra* at 861. These statutes, however, rarely addressed with any preciseness the question of whether a cause of action for tort between married persons could be brought. Consequently, the impact of these statutory laws upon the doctrine of interspousal immunity has been uneven throughout common law jurisdictions. McCurdy, *supra,* 4 *Vill. L. Rev.* at 336. As a result, it is difficult to categorize and characterize the status of the doctrine of interspousal immunity at the present time.

It is generally believed that a majority of jurisdictions favor marital immunity. *Prosser, supra* at 862. Upon close analysis, however, one finds that currently only a handful of courts unqualifiedly retain the doctrine in its pristine formulation. See, *e. g., Paiewonsky v. Paiewonsky,* 446 *F.* 2d 178 (3 Cir. 1971), *cert.* den. 405 *U. S.* 919, 92 *S. Ct.* 944, 30 *L. Ed.* 2d 788 (1972) (applying Virgin Islands law); *Monk v. Ramsey,* 223 *Tenn.* 247, 443 *S. W.* 2d 653 (Sup. Ct. 1969); *Donsbach v. Offield,* 488 *S. W.* 2d 494 (Tex. Ct. Civ. App. 1972). Most have abrogated the concept in varying degrees. For example, many permit suit where the marriage has been terminated by death or divorce. See, *e.g., Jones v. Pledger,* 363 *F.* 2d 986 (D. C. Cir. 1966)

(applying District of Columbia law) *Apitz v. Dames,* 205 *Ore.* 242, 287 *P.* 2d 585 (Sup. Ct. 1955). Several allow recovery for antenuptial torts. See, *e. g., Moulton v. Moulton,* 309 *A.* 2d 224 (Me. Sup. Jud. Ct. 1973); *O'Grady v. Potts,* 193 *Kan.* 644, 396 *P.* 2d 285 (Sup. Ct. 1964). A few have invalidated the immunity in the broad field of automobile negligence. ,See, *e. g., Rupert v. Stienne,* 90 *Nev.* 397, 528 *P.* 2d 1013 (Sup. Ct. 1974); *Richard v. Richard,* 131 *Vt.* 98, 300 *A.* 2d 637 (Sup. Ct. 1973); *Surralt v. Thompson,* 212 *Va.* 191, 183 *S. E.* 2d 200 (Sup. Ct. 1971). Some have sanctioned recovery between spouses for intentional personal injury. See, *e. g., Flores v. Flores,* 84 *N. M.* 601, 506 *P.* 2d 345 (Ct. App.), *cert.* den. 84 *N. M.* 592, 506 *P.* 2d 336 (Sup. Ct. 1973). Others indicate that if the action can be brought against a third party, the action can be maintained even though it assumes a cause of action between spouses. See, *e. g., Fields v. Synthetic Ropes, Inc.,* 215 *A.* 2d 427 (Del. Sup. 1965) (wife's suit against husband's employer for injuries negligently inflicted by husband in course of his employment sustainable).

Some jurisdictions have oscillated. Compare *Taylor v. Patten,* 2 *Utah* 2d 404, 275 *P.* 2d 696 (Sup. Ct. 1954) (abrogating immunity) with *Rubalcava v. Gisseman,* 14 *Utah* 2d 344, 384 *P.* 2d 389 (Sup. Ct. 1963) (reinstating immunity). In several states, the legislature has reacted to judicial initiatives and has passed legislation to overcome or otherwise modify court decisions. *E. g., Ill. Rev. Stat.* ch. 68, § 1 (1953) (*Ill. Ann. Stat.* ch. 40, § 1001 (Smith-Hurd 1977)), (reinstating interspousal immunity) supplanting *Brandt v. Keller,* 413 *Ill.* 503, 109 *N. E.* 2d 729 (Sup. Ct. 1953) (abrogating interspousal immunity); *N. Y. Dom. Rel. Law* § 57 (1937) (*N. Y. Gen. Oblig. Law* § 3–313 (McKinney 1964)) (granting either spouse a right of action against the other for tortious injury to person or property) and *N. Y. Ins. Law* § 109 (3–a) (*N. Y. Ins. Law* § 167 (3)

(McKinney 1939)) (no insurance policy shall be deemed to insure against an injury to an insured's spouse, unless expressly provided for in the policy) superseding *Allen v. Allen,* 246 *N. Y.* 571, 159 *N. E.* 656 (Ct. App. 1927) (disallowing tort suits between spouses); *Wis. Stat.* § 246.075 (1951) and *N. C. Gen. Stat.* § 52–5 (1951) (each authorizing interspousal suits by both spouses) overruling respectively *Fehr v. General Accident Fire & Life Assurance Corp.,* 246 *Wis.* 228, 16 *N. W.* 2d 787 (Sup. Ct. 1944) and *Schollens v. Schollens,* 230 *N. C.* 149, 52 *S. E.* 2d 350 (Sup. Ct. 1949) (each holding that Married Women's Acts authorized suits only by wives against their husbands but not the converse). In fact if any one dominant position can be said to have emerged from this variegated experience, it is that expressed by a plurality of at least twenty jurisdictions which have completely abrogated interspousal immunity. See, *e. g., Klein v. Klein,* 58 *Cal.* 2d 692, 26 *Cal. Rptr.* 102, 376 *P.* 2d 70 (Sup. Ct. 1962); *Freehe v. Freehe,* 81 *Wash.* 2d 183, 500 *P.* 2d 771 (Sup. Ct. 1972). See generally *American Law Institute, Restatement (Second) Torts* (Tentative Draft No. 18) § 895(G) at 72–78 (April 26, 1972); Annot., "Right of one spouse to maintain action against other for personal injury," 43 *A. L. R.* 2d 632 (1955) and Later Case Service. See also Note, 6 *U. of Rich. L. Rev.* 379, 380 (1972); Sanford, "Personal Torts within the Family", 9 *Vand. L. Rev.* 823, 826–832 (1959); Farage, "Recovery for Torts Between Spouses", 10 *Ind. L. J.* 290, 294, 296–300 (1935).

What thus unfolds from a canvass of the doctrine of interspousal immunity across the country is that its application is far from consistent or uniform; its efficacy as a legal principle has divided jurisdictions; and its utility as a social tool or instrument of justice has confounded courts, legislators and commentators. It is clear, nonetheless, that despite its survival in varying forms, interspousal immunity is no longer the doctrinal monolith it was in olden times.

## II

The experience of our State with the doctrine of interspousal immunity in many ways typifies the unstable interaction between a common law tradition whose potency has waned in modern times and statutory laws of uncertain import. New Jersey's Married Persons Act, *N. J. S. A.* 37: 2–1 *et seq.*, portions of which were originally enacted in 1877, sought to accord legal recognition to a wife as a separate individual and in effect give a wife a definable legal identity apart from that of her husband. See, *e.g., N. J. S. A.* 37:2–6 .(married woman may sue or be sued without joining her husband); *N. J. S. A.* 37:2–8 (married woman solely responsible for her torts); *N. J. S. A.* 37:2–9 (married woman may maintain action in own name, without joining her husband, for torts committed against her or her separate property); *N. J. S. A.* 37:2–10 (married woman solely liable for her debts contracted before or after marriage); *N. J. S. A.* 37:2–12 (married woman's right to own separate property); *N. J. S. A.* 37:2–16 (married woman can enter into contracts without joinder of husband; her contracts can be enforced by and against her in her own name and apart from her husband). Nevertheless in our State, no judicial stampede away from the firmly fastened common law concept of interspousal immunity ensued. The cases invariably erected the doctrine as a bar with respect to suits at law. *E.g., Woodruff v. Clark & Apgar,* 42 *N. J. L.* 198 .(Sup. Ct. 1880); *Drum v. Drum,* 69 *N. J. L.* 557 (Sup. Ct. 1903); *Metzler v. Metzler,* 8 *N. J. Misc.* 821, 151 *A.* 847 (Cty Ct. 1930). The courts, in some instances, allowed an action to be maintained in equity but even then limited such causes to those founded on property or contract, *e.g., Gray v. Gray,* 39 *N. J. Eq.* 511 (E. & A. 1885); *Wood v. Chetwood,* 44 *N. J. Eq.* 64 (Ch. 1888), aff'd o.b. 45 *N. J. Eq.* 369 (E. & A. 1899); *Zansinger v. Zansinger,* 46 *N. J. L. J.* 74 (Ch. 1923), but not in tort. *E. g., Von Laszewski v. Von Laszewski,* 99 *N. J. Eq.* 25 (Ch. 1926); *Bendler v.*

*Bendler, supra; Kennedy v. Camp,* 14 *N. J.* 390 (1954); *Koplik v. C. P. Trucking Corp.,* 27 *N. J.* 1 (1958); *Taibi v. DeGennaro,* 65 *N. J. Super.* 294 (Law Div. 1961).

In *Eule v. Eule Motor Sales,* 34 *N. J.* 537 (1961) there was a perceptible movement away from the universal application of the traditional immunity doctrine. That case held that a wife was entitled to bring a tort action against a partnership of which her husband was a member for injuries negligently inflicted by him. The Court found that the threat of marital discord which the immunity was intended to prevent was remote and that the liability of an employee to reimburse the employer was theoretical and anachronistic. *Cf. Hudson v. Gas Consumers' Assoc., supra* (wife entitled to sue her husband's employer on the basis of the husband's negligence, noting that the bar of interspousal immunity is personal to the husband); see also *Felice v. Felice,* 34 *N. J. Super.* 388 (App. Div. 1955) (awarding worker's compensation against a partnership to the wife of a partner, although in a prior case, *Bendler v. Bendler, supra,* a compensation recovery on behalf of a wife had not been approved where the husband was the individual employer). And it was held in *Long v. Landy,* 35 *N. J.* 44 (1961), that a widow may sue her husband's estate for negligent injury which had been inflicted by her husband, the Court observing that "[t]he concept of the unity of husband and wife is terminated upon the death of either spouse and the common law reason for the interdiction against interspousal suits based upon such unity no longer exists when the marriage has been so dissolved by the death of either party". *Id.* at 51. Accord, *Sanchez v. Olivarez,* 94 *N. J. Super.* 61 (Law Div. 1967) (a marital tort could be the basis for a claim after the marriage relationship had been terminated by divorce).

The decisions which recognized an interspousal cause of action in tort, *Eule v. Eule Motor Sales, supra; Hudson v. Gas Consumers' Assoc., supra; Long v. Landy, supra* and

*Sanchez v. Olivarez, supra,* departed from the original common law rule that the marital status of the parties at the time of the tort was determinative of whether a cause of action could ever arise. *Phillips v. Barnet, supra; Abbott v. Abbott, supra.* They did not stray, however, from the core of the common law doctrine, namely, that married persons were as one and, in their relationship as spouses, were not legally capable of suing one another for their tortious conduct.

It was not until *Immer v. Risko, supra,* that there was a sharp and clean, albeit narrow, break from the quintessence of the traditional interspousal immunity doctrine. The Court there characterized the common law marital unity of husband and wife as "fictitious * * *, [a] metaphysical concept [which] cannot be seriously defended today." 56 *N. J.* at 485, 488. It concluded that the foundations for the common law doctrine of interspousal tort immunity had been thoroughly eroded. Having satisfied itself that the immunity doctrine could no longer be sustained by its common law underpinnings, the Court's inquiry shifted to an examination of other reasons and considerations of public policy which had been advanced to warrant the continuation of the doctrine. These were identified as "1) 'the disruptive effect upon the harmony of the family' and 2) 'the possibility of fraudulent and collusive litigation against the frequent real party in interest — the insurance carrier.' " *Id.* at 488; McCurdy, *supra,* 4 *Vill. L. Rev.* at 336–337. Finding these modern day rationales wanting, the Court lifted the bar to interspousal tort actions but, as noted, only high enough to allow automobile negligence actions. The Court eschewed very pointedly any broader abrogation of the doctrine. 56 *N. J.* at 495.

Defendants underscore this express disclaimer in *Immer* and argue, accurately enough, that the Court there went no further than to remove the bar of interspousal immunity in automobile negligence cases. In *Small v. Rockfeld,* 66 *N. J.* 231 (1974), however, the Court took a more expansive view of *Immer.* It ruled that there is no interspousal or intra-

familial immunity in an action brought on behalf of the estate and surviving child as next of kin for the wrongful death of a deceased spouse, the complaint having charged the defendant husband with killing his wife or causing her death through gross negligence. Significantly, it found in *Immer v. Risko* sufficient impulsion to allow redress for egregious marital torts, *viz*:

The reasoning and tenor of Justice Proctor's opinion in *Immer* leave no room whatever for doubt that he, along with the colleagues who joined him, considered the interspousal immunity to have been effectively terminated in our State in situations, such as the one at hand, that are unconcerned with any marital relationship privilege or simple domestic negligence. 56 *N. J.* at 484–495.

[66 *N. J.* at 241].

The velocity of the court's reasoning in *Immer* and *Small* has been perceived in recent decisions. *Tevis v. Tevis*, 155 *N. J. Super.* 273 (App. Div. 1978) (refusing to apply interspousal immunity to a claim based upon an intentional tort committed by a husband against his wife); *Gross v. Sears, Roebuck & Co.*, 158 *N. J. Super.* 442 (App. Div. 1978) (permitting a suit on behalf of a child against his father for an injury arising out of the alleged negligent operation of a lawn mower); *cf. Dower v. Goldstein*, 143 *N. J. Super.* 418 (App. Div. 1976) (refusing to apply intrafamilial immunity in the case of a child bitten by the parents' dog under a statute imposing strict liability on dog owners); *contra, Patterson v. Patterson*, 129 *N. J. Super.* 524 (Law Div. 1974) (action for personal injury attributable to a backyard, cook-out fire barred by marital immunity; the court failed to grasp the strong trend away from interspousal immunity).

In view of the dilated interpretation reflected in *Small* of the precise and discrete holding in *Immer*, the task becomes one of evaluating the spousal tort claims in each of these appeals. The issue for resolution is whether there remains any justification for the continued application of

marital immunity to torts of the character involved in the present cases.

## III

At the outset of our analysis we accept as fundamental the notion that the essence of our civil laws is to achieve justice and, in so doing, provide redress for wrongful injury. 5 *Pound, Jurisprudence,* ch. 32 "Duties of Reparation" 283–346 (1959); *Holmes, The Common Law* 76 (Howe ed. 1963). As the United States Supreme Court has recognized recently, this great impulse of our law applies with special force in the tort area where "* * * over the centuries the common law * * * has developed a set of rules to implement the principle that a person should be compensated fairly for injuries caused by the violation of his legal rights." *Carey v. Piphus,* —— *U. S.* ——, ——, 98 *S. Ct.* 1042, 1049, 55 *L. Ed.* 2d 252, 261 (1968). Our courts are in accord. *E. g., Henningsen v Bloomfield Motors, Inc.,* 32 *N. J.* 358 (1960); *Bexiga v. Havir Mfg. Corp.,* 60 *N. J.* 402 (1972); *Anderson v. Somberg,* 67 *N. J.* 291, *cert.* den. 423 *U. S.* 929, 96 *S. Ct.* 279, 46 *L. Ed.* 2d 258 (1975); *Fox v. Passaic General Hospital,* 71 *N. J.* 122 (1976); *Moran v. Napolitano,* 71 *N. J.* 133 (1976).

In the tort field, immunities, which furnish "absolution from liability", *Prosser, supra* at 970, stand as conflicting exceptions to the general principle that there should be reparation for wrongful injury. Consistent with this conception of justice and fairness many immunities in the evolution of the law have withered or perished as legal relics not fit for survival in contemporary times. *E. g., Collopy v. Newark Eye & Ear Infirmary,* 27 *N. J.* 29 (1958) (charitable immunity); *Willis v. Dep't. of Cons. & Ec. Dev.,* 55 *N. J.* 534 (1970); *P,T&L Constr. Co. v. Comm'r, Dep't. of Transp.,* 55 *N. J.* 341 (1970) (State governmental immunity); *Jackson v. Hankinson,* 51 *N. J.* 230, 234–235 (1968) (local governmental immunity) (although it is recognized that immunity

from suit remains a matter of public policy subject to legislative treatment, e. g., N. J. S. A. 2A:53A–7, –8 (charitable immunity); N. J. S. A. 59:1–1 et seq. (governmental immunity)). Marital and family immunities, like other protective enclaves in the law, have also atrophied over the years. *American Law Institute, Restatement (Second) Torts, supra,* §§ 895H, 895I, 895J; e. g., *Immer v. Risko, supra; France v. APA Transport Corp.,* 56 N. J. 500 (1970) (intrafamilial immunity in automobile negligence suit); *Small v. Rockfeld, supra.*

In *Immer v. Risko, supra,* our reasoning commenced with a consideration of N. J. S. A. 37:2–5, the critical section of the New Jersey Married Persons Act, N. J. S. A. 37:2–1 et seq., to determine whether that provision affected or changed the traditional interspousal immunity under the common law. N. J. S. A. 37:2–5 touched only obliquely the common law or nonstatutory capacity of spouses to sue each other, viz:

Nothing in this chapter contained shall enable a husband or wife to contract with or sue each other, except as heretofore, and except as authorized by this chapter.

The Court reasoned that this provision did not constitute a statutory ratification or perpetuation of the substantive, common law immunity doctrine. In effect, it ruled that the "fluidity of the common law" had been canalized within the banks of the statute, explaining that "the statute did not incorporate immunity, but rather the common law with its inherent capacity for change." *Immer v. Risko, supra,* 56 N. J. at 487.

This rendition of the statute was nourished by observations made earlier in *Long v. Landy, supra,* that N. J. S. A. 37:2–5 did not "freeze" the common law with its immunity doctrine but rather permitted its application as a bar to an interspousal suit "during the existence of the reasons which underlie the common law [immunity] doctrine." 35 N. J.

at 50–51. *Cf. State v. Culver,* 23 *N. J.* 495, 505, *cert.* den. 354 *U. S.* 925, 77 *S. Ct.* 1387, 1 *L. Ed.* 2d 1441 (1957). Following this concept, the *Immer* Court undertook the judicial exercise, in the manner of the common law as it were, to determine whether there existed any reasons which still justly undergird the doctrine of interspousal tort immunity.

The Court first turned its attention to domestic harmony as one important reason for preserving the immunity. It had been pointed out earlier by Justice Jacobs in his *Koplik* dissent that there have been a great many cases where our courts permitted wives to maintain, in equity, contract and property actions against their husbands. He made the trenchant observation that "* * * it is difficult to see how a personal injury action would disrupt tranquillity more than a property or contract action which is admittedly maintainable." 27 *N. J.* at 14–15; see *Prosser, supra* at 618–619; see generally Annot., "Right of one spouse under Married Women's Acts to maintain an action at law against other, based on tort in respect of property, for damages or recovery of possession", 109 *A L. R.* 882 (1937). The truism expressed by Justice Jacobs that "[i]n the rare instance where the wife will sue her husband despite his objection there is probably not much tranquillity to preserve * * *", *Koplik v. C. P. Trucking Corp., supra,* 27 *N. J.* at 14–15, was reiterated in *Immer:* "[W]e are doubtful that the marital relationship will be any more disturbed by allowing a cause of action than by denying it. * * * A person would not sue his spouse if there were perfect harmony, and it is unlikely that adjudication of the rights will worsen the relationship." 56 *N. J.* at 488.

The anomaly of vaunting domestic harmony as a basis for imposing immunity has also been recognized in the judicial treatment of intrafamilial tort actions, a distinctly analogous area. *Prosser, supra* at 887. The doctrine of intrafamilial immunity for torts is indigenous to America, originating with *Hewlett v. George,* 68 *Miss.* 703, 9 *So.* 885 (Sup. Ct. 1891), *McKelvey v. McKelvey,* 111 *Tenn.* 388, 77 *S. W.* 664 (Sup.

Ct. 1903) and *Roller v. Roller,* 37 *Wash.* 242, 79 *P.* 788 (Sup. Ct. 1905). Its dominant philosophy, preserving the family relationship, was adopted and followed in our own jurisdiction. *E. g., Reingold v. Reingold,* 115 *N. J. L.* 532 (E. & A. 1935); *Hastings v. Hastings,* 33 *N. J.* 247 (1960); *Heyman v. Gordon,* 40 *N. J.* 52 (1963); *Franco v. Davis,* 51 *N. J.* 237 (1968). This thinking, however, has now been rejected. On the same day that *Immer v. Risko* was announced, the Court decided *France v. A.P.A. Transport Corp., supra.* There we abandoned the parent-minor child immunity doctrine in motor vehicle negligence actions determining, *inter alia,* that the danger posed to domestic harmony by the threat of such a suit was not a sufficiently substantial or tenable basis for precluding recovery. In *Small v. Rockfeld, supra,* the Court, in holding that there is no interspousal or intrafamilial immunity defense to a wrongful death action, took pains to point out that the early cases establishing the parental immunity doctrine "in the interests of the peace and tranquillity of the family" had done so without authority or persuasive reasons, and that the doctrine had invited a groundswell of condemnation and had been effectively dishonored with respect to suits involving contracts or property interests which were frequently grounded on charges of serious parental misconduct. 66 *N. J.* at 241–242.

Another salient factor in the Court's rejection in *Immer* of domestic harmony as a valid reason for the immunity doctrine was the prevalence of automobile insurance. As Justice Jacobs had mentioned in *Koplik*: " '* * * there is no danger of domestic tranquillity being disturbed by an action for negligence by a wife against her husband who carries indemnity insurance * * *.' " 27 *N. J.* at 15 n. 1. "[R]ealistically", the Court echoed in *Immer,* "[t]he presence of insurance militates against the possibility that the interspousal relationship will be disrupted since a recovery will in most cases be paid by the insurance carrier rather than by the defendant spouse. * * * Domestic harmony may be more threat-

ened by denying a cause of action than by permitting one where there is insurance coverage." 56 *N. J.* at 489.

The danger of marital disruption becomes almost academic where liability insurance is available. While this Court in *Immer* was strongly influenced by the prevalence of automobile insurance, we do not believe that, because general liability insurance covering household and non-automobile accidents is not as widespread as automobile insurance, this should leave claims for tortious injury arising from domestic negligence barred and unredressed. It is probable that general homeowner liability insurance is held by a substantial number of householders and is otherwise readily available. Moreover, in a given case, if there is homeowners' insurance, there is no reason impacting upon marital peace to preclude damages for personal injuries sustained by one spouse at the negligent hands of the other. The fact that some married couples may not have household insurance, should not defeat the claims of others who do have such insurance and whose marital stability is cushioned by that insurance.

There is, in addition to all else, a certain mischief in the unspoken assumption at the heart of the domestic harmony rationale for the immunity doctrine, namely, that in this context courts are somehow fit to monitor marital morality. Courts can claim no penetrating insight by which to fathom the impact of an interspousal law suit or gauge its effect upon the strength or fragility of a marriage. The threat to domestic harmony posed by a legal action between spouses is an imponderable; the cohesiveness of a marriage may be jeopardized as much by barring a cause of action as by allowing it. *Cf. Smith v. Kauffman,* 212 *Va.* 181, 183 *S. E.* 2d 190 (1971) (citing *Immer v. Risko, supra*); *Small v. Rockfeld, supra,* 66 *N. J.* at 238.

Furthermore, "* * * the marital couple is not an independent entity with a mind and heart of its own, but an association of two individuals each with a separate intellectual and emotional makeup." *Eisenstadt v. Baird,* 405 *U. S.* 438,

453, 92 *S. Ct.* 1029, 1038, 31 *L. Ed.* 2d 349, 362 (1972). Happiness in marriage belongs to the married persons and the pursuit of that happiness is personal to them. Note, "Litigation Between Husband and Wife", 79 *Harv. L. Rev.* 1650, 1651–1652 (1966). *Cf. Loving v. Virginia,* 388 *U. S.* 1, 87 *S. Ct.* 1817, 18 *L. Ed.* 2d 1010 (1967) (right to make decisions relating to marriage is personal and private). This thought was caught in *Freehe v. Freehe, supra,* 81 *Wash.* 2d at 189, 500 *P.* 2d at 774:

> If a state of peace and tranquility exists between the spouses, then the situation is such that either no action will be commenced or that the spouses — *who are, after all, the best guardians of their own peace and tranquility* — will allow the action to continue only so long as their personal harmony is not jeopardized. (Emphasis added).

In the final analysis, the choice to sue, or not to sue, should be that of the parties to the marriage, who as individuals are entitled to seek their personal happiness according to their own lights.

■ We, therefore, conclude that the potential danger to marital tranquillity posed by the availability of a legal action for personal injuries based on negligence between spouses cannot be grounds for denying relief.

The second major objection to eliminating interspousal tort immunity is the risk of fraudulent and collusive actions against insurance companies, characterized by the *Immer* Court as "more difficult to answer" than that posted by marital disruption.* 56 *N. J.* at 490. Justice Proctor explained:

---

*It is an irony, not lost to some courts and commentators, that objections based on marital disharmony and fraud are somewhat counter-cyclical. To the extent the threat of marital disharmony can be removed or reduced by the presence or availability of insurance, the potential for fraud is increased; conversely, when the threat of fraud is minimized or eliminated because there is no in-

Of course, there is a possibility of fraud or collusion in every negligence action where the tortfeasor is insured. The degree of danger depends upon the relationship of the parties. The closer the parties are to each other, the greater is the danger. * * * In the family context, the danger of collusion is the greatest of all. Not only are the parties in a close personal relationship, but any recovery will inure to the benefit of the entire family and the failure to recover will affect the entire family adversely.

[*Id.*]

In the cases now before us, and we assume in a great many cases involving household accidents, liability insurance is available. Hence, we cannot dismiss out of hand the argument that the threat of fraud upon an insurance carrier is a real one which cannot easily be overcome in the context of interspousal domestic negligence.

This Court has repeatedly expressed confidence that our judicial system is well-equipped to sift out fraud. *Immer v. Risko, supra,* 56 *N. J.* at 493–495. It said in *France v. A. P. A. Transport Corp., supra,* "[w]e do not believe that the judiciary should continue to refuse to hear an entire class of actions simply because some of these claims may be the product of venality." 56 *N. J.* at 505. Earlier in *Cohen v. Kaminetsky,* 36 *N. J.* 276 (1961) a host-guest case, we explained that "[i]t is the regular business of the courts to find the truth. We ought not deny what should be due the many for fear that the judicial process cannot weed out the spurious claims of a few." *Id.* at 283. *Cf. Moran v. Napolitano, supra,* 71 *N. J.* at 139–140. Moreover, in other similar situations where fraud might well have been considered a troublesome factor due to the familial or close personal relationship of the parties, courts have not even tarried on the point but proceeded directly to resolve the merits of the liability claim. *E. g., Berger v. Shapiro,* 30 *N. J.* 89 (1959); *Pearlstein v. Leeds,* 52 *N. J. Super.* 450 (App. Div. 1958),

surance or insurer to be victimized, the risk of creating marital friction is correspondingly augmented. *Immer v. Risko, supra,* 56 *N. J.* at 489; Note, *supra,* 79 *Harv. L. Rev.* at 1659–1660.

certif. den. 29 *N. J.* 354 (1959) ; *Van Der Woude v. Gatty,* 107 *N. J. Super.* 164 (App. Div. 1969) ; *Benedict v. Podwats,* 109 *N. J. Super.* 402 (App. Div.), aff'd o.b. 57 *N. J.* 219 (1970). Other jurisdictions have agreed that in our adversary system courts are equal to the task of screening out fraudulent claims. *E. g., Klein v. Klein, supra; Freehe v. Freehe, supra; Borst v. Borst,* 41 *Wash.* 2d 642, 653–654, 251 *P.* 2d 149, 155 (Sup. Ct. 1952) ("Courts must depend upon the efficacy of the judicial processes to ferret out the meritorious from the fraudulent in particular cases") ; *Midkiff v. Midkiff,* 201 *Va.* 829, 833, 113 *S. E.* 2d 875, 878 (Sup. Ct. App. 1960) ("If fraud and collusion do exist in an action between brothers, they may be ferreted out in the same manner in which courts and juries handle that situation in other cases") ; Note, *supra,* 79 *Harv. L. Rev.* at 1660; Note, *supra,* 6 *U. of Rich. L. Rev.* at 381.

■ We entertain no doubt that our courts have at their command ample means to cope with the real or asserted spectre of fraud in the context of marital tort claims. For example, the courts could, if necessary, fashion a high standard of care to compensate for the risk of collusion between the parties. McCurdy, *supra,* 43 *Harv. L. Rev.* at 1052. *Cf.* Note, *supra,* 79 *Harv. L. Rev.* at 1657 n. 43, 1661. Or this danger could be addressed by imposing a burden of proof commensurate with the dimensions of fraud perceived in the particular case or situation. *E. g., Cohen v. Kaminetsky, supra; Immer v. Risko, supra; France v. A. P. A. Transport Corp., supra; Gray v. Bradley,* 1 *N. J.* 102, 104 (1948); *Aiello v. Knoll Golf Club,* 64 *N. J. Super.* 156, 160–161 (App. Div. 1960) ; *Sarte v. Pidoto,* 129 *N. J. Super.* 405, 411–412 (App. Div. 1974). Moreover, the full glare of truth may be the best antidote for fraud. Insurance companies might in appropriate circumstances reveal their status in the case, treating the covered defendant-spouse as a hostile witness in order to attack credibility and show that the husband and wife may be scheming to gain a recovery against the insurance company. Ford, "Interspousal Liability for Auto-

mobile Accidents in the Conflict of Laws: Law and Reason Versus the Restatement", 15 *U. Pitt. L. Rev.* 397, 421–423 (1954) ; Note, 13 *Duquesne L. Rev.* 156, 173–174 (1974). And if allegations of fraud reach proportions where insurance coverage itself is questioned or jeopardized, a declaratory judgment action following disclaimer could be brought to air and resolve the claims. *Cf. Ohio Cas. Ins. Co. v. Flanagin,* 44 *N. J.* 504 (1965) ; *Concord Ins. Co. v. Miles,* 118 *N. J. Super.* 551 (App. Div. 1972) ; *Travelers Ins. Co. v. Tymkow,* 91 *N. J. Super.* 184 (App. Div. 1966) ; see *Burd v. Sussex Mutual Ins. Co.,* 56 *N. J.* 383, 391 (1970).

Closely akin to the problems posed by fraud and collusion, and amenable to similar solutions, are those presented by the threat of frivolous, picayune or inflated claims of marital, personal injury. Here also, courts have the capacity to scotch such overreaching on the part of married couples. The danger from this quarter is met most efficaciously by defining and delineating marital conduct which cannot and should not be the basis for tort litigation.

There is a range of activity arising in the course of a marriage relationship beyond the reach of the law of torts. Special matters of privacy and familiarity may be encompassed by a marital or nuptial privilege and fall outside the bounds of a definable and enforceable duty of care. Certain conduct may also be regarded as "consensual", involving the "give-and-take" and subtle ebb and flow of married life. In these areas courts and juries cannot be expected to grasp sensibly and consistently the acceptable norm of married living or chart the parameters of reasonable marital behavior as a predicate for affixing liability in tort. *Immer v. Risko, supra,* 56 *N. J.* at 495; *cf. Small v. Rockfeld, supra,* 66 *N. J.* at 244; Note, *supra,* 79 *Harv. L. Rev.* at 1656.

Similarly, certain kinds of claimed injuries between married persons will be based on simple domestic carelessness arising from activities which partake of the everyday exigencies of regular household existence and, for that reason, may not readily be controlled or influenced by the law of torts

through the judicial imposition of a duty of care and the corresponding obligation to respond in damages for its breach. *Cf. Small v. Rockfeld, supra.* Thus, absent the immunity bar, the fear that trivial, exaggerated or unrealistic claims for personal injury will be brought by married persons is counterpoised by the realization that such claims for the most part will not be cognizable by courts or rewarded by juries.

In consequence, based upon our confidence in the resilience and versatility of our courts to address the dangers of fraud and collusion, in either their most virulent forms or in their less noxious guises of simple pettiness or overreaching, interspousal immunity from tort actions cannot be sustained upon these grounds.

We add, on a closing note as to the existence of reasons asserted for the continuation of the doctrine of interspousal immunity, that no court in this day and age subscribes seriously to the view that the abrogation of marital immunity for tortious injury is "unnecessary" because redress for the wrong can be obtained through other means. This additional, "alternative remedy" theory was advanced generations ago as a justification for retaining interspousal tort immunity in *Thompson v. Thompson,* 218 *U. S.* 611, 31 *S. Ct.* 111, 54 *L. Ed.* 1180 (1910) and was even then the subject of dissent. 218 *U. S.* at 619–624, 31 *S. Ct.* at 113–114, 54 *L. Ed.* at 1183–1185 (Harlan, J., joined by Holmes and Hughes, JJ.). The criminal law may vindicate society's interest in punishing a wrongdoer but it cannot compensate an injured spouse for her or his suffering and damages. *Tevis v. Tevis, supra.* See also *Farage; supra,* 10 *Ind. L. J.* at 301 (mere negligence not cognizable in criminal courts). Divorce or separation provide escape from tortious abuse but can hardly be equated with a civil right to redress and compensation for personal injuries. *Id.; Freehe v. Freehe, supra,* 81 *Wash.* 2d at 187–188, 500 *P.* 2d at 774–775. Equally arcane and unworthy is the notion that a wronged spouse,

who has been injured at the hands of her or his mate, can and should resort to an arsenal of "private sanctions". Regardless of the ways a person can "get back" at one's spouse, they do not add up to an enforceable civil right of recovery for damages. Note, *supra*, 79 *Harv. L. Rev.* at 1655.

We thus reach the conviction that where personal injuries are tortiously inflicted by one spouse upon another, it is just and fair that compensation in appropriate circumstances be afforded the wronged and injured party and, to this end, a suit be allowed to effectuate such recovery. In so doing courts can, and should strive to, overcome the genuine concerns stemming from the ever-present possibility of fraud and collusion. Recognition of the right in an injured spouse to seek redress for tortious injury against the offending spouse in a suitable case constitutes judicial neutrality toward married persons. It is an attitude based upon the circumspect and modest belief that courts are not the keepers of the marital conscience and are not omniscient or inspired to intuit the mysterious and complex ways marriages rise and fall. It adopts as a premise that it is given, not to judges, but to the married individuals, to make the difficult choices in the search for their personal happiness and well-being. And the right to bring a lawsuit for compensation for wrongful injury is an option or choice that ought not be denied a person solely because of marriage.

In conclusion, we recognize that there still remain situations wherein, as a matter of law or fact, claims for personal injuries between married persons will not justify a recovery of damages. We hold that, subject to these excepted areas which are best left to be defined and developed on a case-by-case basis, there presently exists no cogent or logical reason why the doctrine of interspousal tort immunity should be continued and it is hereby abrogated as a bar to a civil suit between married persons for damages for personal injuries.

## IV

In view of our ruling, the cases before us on appeal will have to be remanded for trial. It is appropriate, therefore, for the guidance of the trial courts, to comment further upon the · application of the general principles herein discussed to the present cases.

On the records before us the conduct charged to the offending spouse in each case does not in the slightest indicate that a trier of fact or trial court would have to deal with marital privilege or other circumstances suggesting consent or the acceptance of jointly shared risks special to the particular marriage, factors which might otherwise constitute matters of defense and serve to excuse the injurious behavior of the defendant spouse and avoid liability in tort. The asserted tortious behavior in these cases does not trench remotely upon the privileged or consensual aspects of married life.

Moreover, the activity giving rise to the injuries in each case, according to the facts in the records on appeal, could not be characterized as simple domestic negligence. The activity in each case involved a distinct element of special danger and an unusual risk of injury or harm if not performed with reasonable care and ordinary caution. Thus, in the Merenoff case, the hedge clipper in the hands of Allen became a dangerous instrumentality and his careless handling of it resulted in the traumatic, partial amputation of his wife's finger; and in the Mercado case, it appears that the solvent was applied without proper precautions by Santos in circumstances which created a substantial risk of injury from fire, which in fact occurred.

We would also point out that, in view of the traumatic nature of the injuries suffered, and the undoubted need for immediate help and medical assistance for the injured parties, it is to be expected that the accidents were investigated and in some measure subject to corroboration by the insurance carrier. This is a circumstance which would

mitigate somewhat the risk of a fraudulent scheme between the spouses.

■ ■ We do not discern against this background a need to adopt a special standard of care different from the ordinary duty of reasonable care under all the circumstances. In effect the ordinary standard of care as between married people, correctly and fairly applied, will reflect the root fact and realities of married life. It is because spouses enjoy mutual liberties with one another and share jointly certain risks in their own lives together, that the ordinary standard of care applied in the marital context should enable a trier of fact to differentiate qualitatively between the conduct of married and unmarried persons and to recognize that certain behavior as between a married couple is acceptable and reasonable, even though such conduct might well be considered unreasonable and result in liability if engaged in by unmarried persons. *Courtney v. Courtney,* 184 *Okl.,* 395, 402–403, 87 *P.* 2d 660, 667–668 (Sup. Ct. 1938); McCurdy, *supra,* 42 *Harv. L. Rev.* at 1052; Note, *supra,* 79 *Harv. L. Rev.* at 1657 n. 43, 1661; Farage, *supra,* 10 *Ind. L. J.* at 302–303.

■ Similarly, we perceive no necessity for departing from the accepted burden of proof applicable to negligence actions in general, namely, a preponderance of the evidence. In other situations where the potential for fraud is strong because of the relationship of the parties, we have not seen fit to tamper with the ordinary duty of care or burden of proof. *E.g., Cohen v. Kaminetsky, supra.* Nor have we done so with respect to the abrogation of the marital and family immunities undertaken thus far. *E.g., Immer v. Risko, supra; France v. A.P.A. Transport Corp., supra; Small v. Rockfeld, supra.* If time reveals flaws in this approach, we will not hesitate to select a burden of proof. as well as a standard of care, adequate to meet the problem.

As to the additional broad remedies which the insurance carrier may marshall to combat fraud, the present state of

the records in these cases is insufficient for us to decide their appropriateness or applicability.

Accordingly, the judgments below are reversed and the matters remanded. It is to be understood, in view of the significant change in the law represented by the decision in these cases, that the effect and application of our holding, except as to the cases now adjudicated, shall be prospective only. *Darrow v. Hanover Twp.*, 58 *N. J.* 410 (1971); *Gotsch v. Gotsch*, 63 *N. J.* 217 (1973).

*For reversal and remandment*—Chief Justice HUGHES and Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER—7.

*For affirmance*—None.