152 N.J. Super. 283 (1977)
377 A.2d 962
STATE OF NEW JERSEY, PLAINTIFF,
v.
CRYSTAL HOFFORD ET AL., DEFENDANTS.
Superior Court of New Jersey, Law Division (Criminal).
Decided July 22, 1977.
*287 Mr. Robert A. Coogan and Mr. Robert I. Ansell for defendants (Mr. Coogan, attorney for defendant Crystal Hofford; Messrs. Anschelewitz, Barr, Ansell & Bonello, attorneys for defendant James Hofford).
Mr. Douglas C. Wain for the State (Mr. James M. Coleman, Jr., Prosecutor of Monmouth County, attorney).
ARNONE, J.S.C.
Both defendants here move for a new trial pursuant to R. 3:20-1; they also move for an order entering judgments of acquittal on the three counts of the indictment on which the jury returned verdicts of guilty.
Defendants were found guilty of (1) cruelty to Ana Hofford, (2) cruelty to Juliet Hofford and (3) possession of controlled dangerous substance [paregoric and/or oxazepam].
The standard to be applied by the trial court on a motion for a judgment of acquittal is the same whether the motion is made at the end of the State's case or at the end of the entire case. State v. Kluber, 130 N.J. Super. 336, 341-342 (App. Div. 1974), certif. den. 67 N.J. 72 (1975). This standard is set forth in State v. Reyes, 50 N.J. 454 (1967), as follows:
The broad test for determination of such an application is whether the evidence at that point is sufficient to warrant a conviction of the charge involved. R.R. 3:7-6. More specifically, the question the trial court must determine is whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt. [at 458-459]
See also, State v. Mayberry, 52 N.J. 413, 436-437 (1968), cert. den. 393 U.S. 1043, 89 S.Ct. 673, 21 L.Ed.2d 593 (1969); State v. Kluber, supra.
The obligation of the court is to consider the State's proofs in the light of the foregoing standard. State v. Reyes, *288 supra; State v. Van Duyne, 43 N.J. 369, 377 (1964), cert. den. 380 U.S. 987, 85 S.Ct. 1359, 14 L.Ed.2d 279 (1965); State v. Moffa, 42 N.J. 258, 263 (1964).
The trial court is not to attempt to weigh the State's evidence  the court is not concerned with the worth, nature or extent (beyond a scintilla) of the State's evidence, but only with its existence viewed most favorably to the State. State v. Kluber, supra; State v. Muniz, 150 N.J. Super. 436, 375 A.2d 1234 (App. Div. 1977).
No consideration is to be given to any evidence or reasonable inferences to be drawn therefrom adduced on defendants' case. State v. Gora, 148 N.J. Super. 582, 596 (App. Div. 1977); State v. Lemken, 136 N.J. Super. 310, 314 (App. Div. 1975).
Here the State presented testimony of Bart Cox, a patrolman with the Wall Township Police Department; Nancy Blunck of the Wall Township First Aid Squad; Richard Coumbis, a forensic scientist; Dr. Donald Shields, the chief pathologist at Pt. Pleasant Hospital; Dr. Richard Reutter, who treated Juliet Hofford at Jersey Shore Medical Center, and Joan Blum and Lynn Decker Crue, both of the Division of Youth & Family Services.
The testimony elicited from these witnesses tended to establish that late in the morning on May 12, 1976 defendants sought help for Ana Hofford who was having difficulty breathing.
In response to this request for help, initially Officer Cox and later Nancy Blunck arrived at the residence in Wall Township where the Hoffords were staying. While at the house it was determined, as a result of questions directed to defendants, that a possible cause of the child's difficulties might be paregoric, which had been administered by defendants to Ana the night before.
After mouth-to-mouth resuscitation was administered to Ana without success, the Wall Township First Aid Squad brought her to Pt. Pleasant Hospital.
*289 Shortly after Ana Hofford was brought to the hospital the First Aid Squad responded to a second request for assistance at the house where the Hoffords were staying. Upon their arrival the First Aid Squad found that Ana Hofford's twin sister, Juliet, was also having difficulty breathing. About an hour after Ana Hofford arrived at Pt. Pleasant Hospital, Juliet Hofford was brought to that hospital.
Subsequent questioning of defendants in an attempt to determine what caused the children's conditions in order to facilitate treatment revealed that both children had been given doses of paregoric the previous night.
Ana Hofford was dead on arrival at Pt. Pleasant Hospital. Juliet Hofford, although in serious condition on arrival at Pt. Pleasant Hospital, was successfully treated after transfer to Jersey Shore Medical Center, and subsequently released from that hospital.
An autopsy and subsequent tests of Ana Hofford revealed the presence of oxazepam and morphine in her vital organs. Oxazepam is a tranquilizer; paregoric contains morphine and is used for treatment of a variety of minor ailments.
Paregoric is a controlled dangerous substance prescribed in Schedule III by virtue of N.J.S.A. 24:21-7(f) (8).
Oxazepam is a prescribed controlled dangerous substance listed in Schedule IV (N.J.S.A. 24:21-8) pursuant to authority granted to the Commissioner by N.J.S.A. 24: 21-3. See N.J.A.C. 8:65-10.1.
The amount of morphine contained in the liver was determined to be significant in that it could account for the cause of death. Further, there was evidence from which the jury could find that morphine and oxazepam in combination have an "additive" effect, that is, the cumulative effect would be greater than the sum of the two elements.
There was further testimony that Juliet Hofford had responded affirmatively to NARCAN, a narcotic antagonist. This response was manifested by her revival from a comatose state after its administration. There was also testimony that such a reaction to NARCAN is indicative of a narcotic *290 overdose and that the drug which had caused the overdose had been administered several hours prior to Juliet's admission to the hospital.
A jury, on the basis of the above evidence, could find that defendants were the parents of the twins; that defendants had custody of the children; that defendants had possession of paregoric and/or oxazepam, both prescribed controlled dangerous substances; that the condition of both children was the result of administering paregoric and/or oxazepam to the children; that the paregoric and/or oxazepam was intentionally administered to the children and that the intentional act of administering paregoric and/or oxazepam caused unnecessary pain and suffering to be inflicted upon the children, as reflected by the death of Ana and by the critical condition in which Juliet arrived at the hospital.
Here "cruelty," as defined by N.J.S.A. 9:6-3, is a "willful act of commission whereby unnecessary pain and suffering is caused to be inflicted on a child." Cruelty to Ana Hofford and cruelty to Juliet Hofford respectively were what defendants were charged with under the second and third counts of the indictment.
This court is satisfied that the evidence as supplied by the various witnesses for the State and the logical inferences to be drawn therefrom, considered in a light most favorable to the State, was sufficient for the jury, the triers of fact, to find defendants guilty of those charges.
Possession of controlled dangerous substances is defined in N.J.S.A. 24:21-20. This court finds that there was sufficient evidence from which a jury could infer that defendants possessed substances which were in fact paregoric and/or oxazepam; that defendants knew that the substances in their possession were paregoric and/or oxazepam and that their possession was intentional.
These inferences could be sustained either by the evidence of the presence of those substances in Ana Hofford's vital organs or by statements made by defendants as to possible causes of their children's conditions.
*291 The court is convinced that there was sufficient evidence to defeat a motion for judgment of acquittal with regard to the count charging possession of CDS [controlled dangerous substances]. Therefore the motions for judgments of acquittal with respect to the second, third and fourth counts of the indictment are denied.
Remaining for consideration are defendants' motions for new trials.
The appropriate test to be utilized by a trial judge in the determination of such a motion is whether there has been a manifest denial of justice under the law. State v. Sims, 65 N.J. 359, 373 (1974).
Defendants' first argument in support of the motion for a new trial is that the testimony of Dr. Richard Reutter should have been barred for failure of the prosecutor to comply with the discovery rule R. 3:13-3(f). Defendants assert that the scope of the doctor's testimony far exceeded that of a treating doctor of Juliet Hofford and as such the prosecutor made insufficient disclosure.
A review of the testimony of Dr. Reutter reveals that he testified to what Juliet's condition was when she entered into his care, what that condition indicated to him as to possible causes of the condition, what treatment he prescribed as a result of his tentative diagnosis of her condition  more specifically, what medication was used, and since that medication was successful in treating her condition, what that indicated as to the cause of that condition.
This court finds that that testimony was nothing more than the verbalization of the thought process, and the knowledge underlying that thought process, that would be the basis of any treating physician's diagnosis and treatment.
Defendants argue surprise but it should be noted that they had possession of copies of Juliet's hospital files. These files indicate that Dr. Reutter was the treating physician; they also indicate what medication Juliet Hofford received.
This is not a situation where prior notes or statements relating to the subject matter of the doctor's direct testimony *292 were withheld by the State. Cf. State v. Hunt, 25 N.J. 514, 530-531 (1958); State v. Farmer, 48 N.J. 145, 164 (1966).
Further, it does not appear that the absence of written reports other than the hospital records can be ascribed to bad faith on the part of the prosecutor. Id.
It should also be noted that R. 3:13-3 by its terms applies only to written statements or memoranda. Cf. R. 4: 17-4(a) which states in part "reports of [the] expert, either written or oral * * *." See also, State v. Farmer, supra at 164, where the Supreme Court noted without comment that the trial court had held that information communicated to the prosecutor orally by prospective witnesses need not be disclosed prior to trial.
Finally, although defendants knew Dr. Reutter was the treating physician to Juliet Hofford, they made no attempt to interview him prior to trial. Also, defendants were given an opportunity to prepare to meet the evidence testified to by the doctor by the court's grant of a brief continuance. State v. Moore, 147 N.J. Super. 47, 51 (App. Div. 1977).
Defendants also claim that Mrs. Hofford was prejudiced by certain testimony of Mrs. Blunck that should not have been admitted into evidence. Mrs. Blunck testified that Mr. Hofford stated "we gave the baby paregoric." Mrs. Hofford argues that the testimony was inadmissible by virtue of State v. Deatore, 70 N.J. 100, 115 (1976).
This court finds that in view of the fact that both defendants voluntarily testified, the court need not reach that issue, for if any prejudice resulted, in view of all the evidence in the case, it was harmless beyond a reasonable doubt. Cf. State v. Biddle, 150 N.J. Super. 180, 375 A.2d 283 (App. Div. 1977).
Finally, defendants argue that there was error in the judge's charge to the jury with respect to the intent necessary for a finding of guilt on counts two and three. In addition, they urge that the error was compounded by the judge's answer in the negative to a question by the jury as to the *293 necessity of a finding of intent to inflict pain and suffering or injury upon the children in order for the jury to return a guilty verdict on those two counts.
Both the charge and the response to the jury question were premised upon the cases of State v. Burden, 126 N.J. Super. 424, 426-427 (App. Div. 1974), certif. den. 65 N.J. 282 (1974), and State v. Rivera, 133 N.J. Super. 453, 455-456 (App. Div. 1975).
In State v. Burden the court reiterated the established rule that
The Legislature has the power to designate the mere doing of an act as a crime, even in the absence of the mens rea which was a prerequisite at common law.
Whether a statute provides criminal sanctions for proscribed conduct without the necessity of proving criminal intent is a matter of legislative intent.
The court then held that

N.J.S.A. 9:6-1 was enacted to protect children against certain evils incident to their early life. See Vega v. Sullivan, 2 N.J. Misc. 385, 387 (Sup. Ct. 1924). One of those evils was neglect, which is delineated by the Legislature to consist, among other acts and omissions, of willfully failing to provide proper and sufficient food, clothing, maintenance, required school education, medical and surgical attention and a clean and proper home. In view of the remedial nature of this statute, evil intent or bad motive is not required to prove child neglect thereunder. The word "willfully" in the context of this statute means intentionally or purposely as distinguished from inadvertently or accidentally. Hence, N.J.S.A. 9:6-1 does not require proof that defendant acted with an evil intent and knew that harm would result from her conduct to satisfy the burden of proof cast upon the State in this case.
State v. Burden on its facts was limited to child neglect cases. However, State v. Rivera extended its holding to child cruelty cases. In that case the court stated, after citing Burden, that
In view of the remedial purpose of the statute  the protection of young children against evils incident to their early life  this reasoning *294 is applicable to a construction of the statute involving an allegation of cruelty as in this case. Accordingly there was no error, no less plain error, in the failure of the trial judge to instruct the jury that intent in the sense of evil motive was a requisite.
State v. Burden, it should be noted, has recently been cited with approval in an Appellate Division case, State v. Muniz, supra, which case involved child cruelty.
Defendants argue that the holdings of Burden and Rivera should not be extended beyond their facts. They claim that if those holdings are so extended, it could lead to liability in a situation where a parent with the best of intentions gives aspirin to a sick child, where the aspirin for unknown reasons has a detrimental effect on the child's health.
Defendants' argument, simply put, is that a defendant must have a culpable mental state in order to be found guilty of child cruelty.
They argue that the child cruelty statute should not be deemed to be one imposing strict liability.
The proposed New Jersey Penal Code, § 2C:2-2(c) (3), provides:
Construction of statutes not stating culpability requirement. Although no culpable mental state is expressly designated in a statute defining an offense, a culpable mental state may nevertheless be required for the commission of such offense, or with respect to some or all of the material elements thereof, if the proscribed conduct necessarily involves such culpable mental state. A statute defining a crime, unless clearly indicating a legislative intent to impose strict liability, should be construed as defining a crime with mental culpability. This provision applies to offenses defined both within and outside of this code.
The commentary to Code subsection (c) (3) points out that the subsection "suggests that in interpreting penal legislation, the fact that no culpability requirement is stated does not preclude reading the statute to include such an element. Second, a form of presumption against strict liability is created. A clear legislative intent to impose that type of liability is required."
*295 At common law the constituents of a criminal offense are an evil intention and an unlawful act.
But it is within the competency of the lawgiver, in the common interest, to declare an act criminal irrespective of the knowledge or motive of the doer of the act. The Legislature may make the doing of the prohibited act criminal or penal, regardless of a corrupt or criminal purpose or even knowledge of the illegal character of the act; and in such case only the doing of the proscribed act need be shown. The criminal mind is not essential where the Legislature has so willed. The doer of the act may be liable criminally even though he does not know the act is criminal and does not purpose to transgress the law. [State v. Labato, 7 N.J. 137, 149-150 (1951); citations omitted]
In every case the question is whether the Legislature, in enacting the statute at issue, intended to impose absolute criminal liability without regard to criminal intent. State v. Tillem, 127 N.J. Super. 421, 426 (App. Div. 1974).
Examples of instances where the Legislature imposed criminal liability without regard to criminal intent abound in our criminal statutes. See, e.g., N.J.S.A. 2A:119-3 (the "loan sharking" statute) where, because of the invidious nature of "loan sharking" and the menace and detriment it posed to the public welfare, proof of wrongful intent is not required; N.J.S.A. 2A:151-42 (dealing with transportation of firearms used for hunting purposes) where, because of the high dangers incident to the open handling or display of rifles and shotguns while traveling to hunting areas, the Legislature mandated the act itself unlawful without any requirement of mens rea; N.J.S.A. 2A:138-1 ("statutory rape") where that portion of the statute does not require criminal intent; there the Legislature, on the grounds of social policy, to protect the morals of young girls, has done away with the requirement of proof of criminal intent.
The legislative history of N.J.S.A. 9:6-1 and N.J.S.A. 9:6-3 provides some help in discerning the legislative intent here. Both statutes were adopted, in their basic present form, by L. 1915, c. 246, § 2 and § 3. That bill was entitled "an act concerning the welfare of children." *296 The statutes were amended by L. 1918, c. 85, § 2 and 3. The legislative statement accompanying that bill stated in part that "This bill is one of a series of seven bills that have been drafted with the object of furnishing better protection to the child * * * new laws have been enacted to protect and promote the welfare of children."
The original act was further amended by L. 1944, c. 196, § 1. The legislative statement there noted that its purpose was to increase the length of sentence for the crime of cruelty and neglect of minor children.
The whole thrust of the child cruelty statute is the protection of the health and welfare of the minor child. Its purpose was the protection of young children against evils incident to their early life. In order to effectuate that goal, the emphasis of necessity had to be on the injury, of whatever nature, suffered by the child. The thrust of the statute was not directed towards the person who inflicted that injury. As such, once an injury to a young child is shown to have occurred, the only requirement is that it not be accidental. In view of the enormity and the seriousness of the harm sought to be avoided, it cannot be said that the Legislature was misguided when it so acted. As noted above, there are other instances in our criminal statutes where the Legislature has not imposed a requirement of criminal intent.
Infants have generally been a favored class for special protection in New Jersey. The Legislature, in view of the harm sought to be avoided, cannot be said to have acted in an unreasonable manner when it enacted the child cruelty statute without providing for proof of criminal intent.
It should also be noted that the reasonable exercise of prosecutorial discretion has recently been affirmed in New Jersey. State v. Leonardis, 73 N.J. 360, 375 A.2d 607 (1977) [Leonardis II].
If a situation such as defendant alluded to were to arise, the prosecutor, in the exercise of his discretion, could forego prosecution. Moreover, the circumstances which give rise to *297 prosecution are always important considerations for the sentencing judge.
Where, however, the Legislature has spoken, its mandate can not and should not be thwarted by the courts to achieve a result not contemplated or intended by the Legislature. Where that mandate is clearly expressed and there is no warrant for alternative construction, a court may not impose its view as to what the law should be. State v. Fearick, 69 N.J. 32, 37-38 (1976). In this instance the Legislative Branch has spoken, the Appellate Division has interpreted that directive, and it is this court's duty to enforce the law as written.
The statute imposes strict liability on a parent under the facts of this case, where the State has shown an intentional, nonaccidental act that resulted in pain and suffering to a child.
This court finds that a manifest denial of justice does not clearly and convincingly appear.
For the above reasons, defendants' motions for a new trial are denied.