JENNIFER FOLDI, AN INFANT BY HER GUARDIAN AD LITEM, HERBERT M. KORN, PLAINTIFF-APPELLANT, v. DORSIE G. JEFFRIES AND FLORENCE JEFFRIES, DEFENDANTS, AND MICHAEL FOLDI AND BERNADINE FOLDI, DEFENDANTS-RESPONDENTS.

Argued February 22, 1983—Decided July 13, 1983.

*R. Jerome Jabbour* argued the cause for appellant (*Lucid, Jabbour, Pinto & Rodgers,* attorneys).

*Donald S. McCord, Jr.,* argued the cause for respondents (*O'Donnell, McCord & Leslie,* attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

Today we return to the thorny problem of ascertaining the parameters of the doctrine of parent-child tort immunity. Specifically, we consider whether the doctrine of parental immunity bars recovery by an unemancipated minor for personal injuries arising from an accident attributable to her mother's negligent lack of supervision. Resolution of this question requires us to decide whether to continue to apply our holdings in *France v. A.P.A. Transp. Corp.,* 56 *N.J.* 500 (1970), and *Small v. Rockfeld,* 66 *N.J.* 231 (1974), to all tort actions, except some special areas involving the "exercise of parental authority and adequacy of child care." *Small,* 66 *N.J.* at 244 (construing *France,* 56 *N.J.* at 507).

For purposes of this appeal, the essential facts are not disputed. On May 7, 1974 at approximately 6:30 p.m., plaintiff Jennifer Foldi, then 2½ years old, accompanied her mother to the front yard of their family residence in Morris Plains. Mrs. Foldi knelt and began planting some greenery on the side of the house. Jennifer was at her side, with a sand bucket and a garden trowel. While Mrs. Foldi was gardening, Jennifer wandered out of the yard and over to a neighbor's residence two doors away. There she was bitten on the face by a dog.

Mrs. Foldi, busy in the garden, had been unaware that her daughter had wandered off. As soon as she noticed that Jennifer had disappeared, she ceased her gardening and began to search for her. In her deposition Mrs. Foldi stated that only 5 to 10 minutes elapsed from the time that she had last seen Jennifer to the time that she found her in the neighbor's driveway.

Jennifer, by her guardian ad litem, filed a complaint in Superior Court against Dorsie and Florence Jeffries, the dog's owners. Mr. and Mrs. Jeffries filed an answer and a third party complaint against Jennifer's parents, alleging contributory negligence and seeking indemnification from the Foldis for resulting costs and damages. Thereafter, Jennifer filed an amended complaint adding her parents as defendants in the suit.

The trial court granted the Foldis' motion for summary judgment against Jennifer and the Jeffries, invoking the doctrine of parent-child immunity. Subsequently, the court entered an order that settled all claims between Jennifer and the Jeffries. The Appellate Division affirmed, 182 *N.J.Super.* 90 (1981), holding also that the parental immunity doctrine barred Jennifer's claim and the Jeffries' third-party claim for indemnity. Judge Furman dissented for the reasons set forth in his opinion in *Convery v. Maczka,* 163 *N.J.Super.* 411 (Law Div.1978).

On the basis of the dissent below, Jennifer filed an appeal as of right to this Court, pursuant to *R.* 2:2–1(a)(2). We affirm the Appellate Division's judgment.

I

The English common law did not recognize the doctrine of parental immunity. The doctrine emerged later in this country in three state court decisions, sometimes referred to as "The Great Trilogy." In the first, *Hewlett v. George,* 68 *Miss.* 703, 9 *So.* 885 (1891), the Supreme Court of Mississippi refused to allow an unemancipated daughter to maintain a claim of false imprisonment against her mother for maliciously committing her to an insane asylum. The court cited no legal authority for its holding, but based its position on the grounds that "[t]he peace of society, and of the families composing society, and a sound public policy, designed to subserve the repose of families and the best interests of society . . ." forbid a minor child from suing his or her parent for personal injuries. 68 *Miss.* at 711, 9 *So.* at 887.

*Hewlett* was followed twelve years later by *McKelvey v. McKelvey,* 111 *Tenn.* 388, 77 *S.W.* 664 (1903). In *McKelvey* the Tennessee Supreme Court denied a child the right to sue her father and stepmother for alleged cruel and inhumane treatment that the stepmother had inflicted upon her with the father's consent. In reaching that conclusion, the court relied upon the parent's right to control and discipline the child. 111 *Tenn.* at 390, 77 *S.W.* at 664. It also analogized parental immunity to the pre-existing doctrine of spousal immunity, viewing both concepts as supportive of unity within the family. *Id.* at 392, 77 *S.W.* at 665. The final case in the Trilogy, *Roller v. Roller,* 37 *Wash.* 242, 79 *P.* 788 (1905), reached the absurd result of refusing to entertain a civil suit by a minor against her father who had been convicted of raping her. As support for its position, the Supreme Court of Washington relied on the spousal immunity analogy, the problem of shifting family assets away from the support of other children in the household, and the difficulty of distinguishing between serious parental misconduct warranting recovery and less extreme torts that should be immunized. 37 *Wash.* at 243, 79 *P.* at 788–89.

Numerous states thereafter adopted the doctrine of parent-child immunity and applied it to both negligent and intentional torts. *Prosser, Torts,* § 122 at 865 (4th ed. 1971). Yet, as various jurisdictions decided cases dealing with the issue, several exceptions and qualifications emerged. *Id.* at 866–67. As a result, it is difficult to generalize about the status of the doctrine today. Few states retain unqualified parental immunity for all tortious acts. *E.g., Owens v. Auto Mut. Indem. Co.,* 235 *Ala.* 9, 177 *So.* 133 (1937) (complete immunity); *Horton v. Unigard Ins. Co.,* 355 *So.*2d 154 (Fla.Dist.App.1978), *cert. dismissed,* 379 *So.*2d 459 (Fla.1979) (same); *McNeal v. Administrator of Estate of McNeal,* 254 *So.*2d 521 (Miss.1971) (same). Some jurisdictions have totally abolished the immunity. *E.g., Gibson v. Gibson,* 3 *Cal.*3d 914, 479 *P.*2d 648, 92 *Cal.Rptr.* 288 (1971); *Rupert v. Stienne,* 90 *Nev.* 397, 528 *P.*2d 1013 (1974); *Falco v. Pados,* 444 *Pa.* 372, 282 *A.*2d 351 (1971); *Elam v. Elam,* 275 *S.C.*

132, 268 *S.E.*2d 109 (1980); *Wood v. Wood,* 135 *Vt.* 119, 370 *A.*2d 191 (1976). Most states, however, including New Jersey, have partially abrogated the doctrine. *See generally* Annot., "Liability of Parent for Injury to Unemancipated Child Caused by Parent's Negligence—Modern Cases," 6 *A.L.R.* 4th 1066, § 13 at 1113–25 (1981), and cases cited therein. These varied authorities indicate that parental immunity, like interspousal immunity, "is no longer the doctrinal monolith it was in olden times." *Merenoff v. Merenoff,* 76 *N.J.* 535, 543 (1978).

## II

The development of the doctrine of parental immunity in New Jersey typifies its evolution in many other states. The doctrine of parent-child immunity was first recognized in this State in *Reingold v. Reingold,* 115 *N.J.L.* 532 (E. & A. 1935). In that case, a nineteen year-old unemancipated child was precluded from recovering damages for injuries suffered as a passenger in an automobile owned by her stepmother and negligently driven by her father. The Court of Errors and Appeals articulated as the main reason for its opinion the preservation of family tranquility, citing *Hewlett* and its progeny as authority. *Reingold,* 115 *N.J.L.* at 535.

*Reingold* was followed by three decisions of this Court: *Hastings v. Hastings,* 33 *N.J.* 247 (1960); *Heyman v. Gordon,* 40 *N.J.* 52 (1963); and *Franco v. Davis,* 51 *N.J.* 237 (1968). All three cases involved ordinary negligence of a parent in operating a motor vehicle. In each case, the doctrine of parental immunity was upheld by a slim 4-to-3 majority. The dissenting opinions in *Hastings, Heyman,* and *Franco,* all authored by Justice Jacobs, noted the erosion of parental immunity in other states and urged that this state follow the trend. *Hastings,* 33 *N.J.* at 253–61; *Heyman,* 40 *N.J.* at 55–60; *Franco,* 51 *N.J.* at 242–43.

In *France v. A.P.A. Transp. Corp.,* 56 *N.J.* 500 (1970), we, for the first time, partially repudiated the parental immunity doctrine. There we held that an unemancipated child could sue his

or her parent for injuries that resulted from the parent's negligent operation of a motor vehicle. *Id.* at 507. In considering whether such parental negligence should remain immunized, we observed that various exceptions and qualifications that had been judicially fashioned to limit the immunity doctrine had led to "anomalous results." *Id.* at 504. We specifically noted the incongruity of disallowing a minor child's negligence action against a parent, while permitting a child to sue his parent in property or contract, *In re Flasch,* 51 *N.J.Super.* 1 (App.Div.), certif. den., 28 *N.J.* 35 (1958), and to bring tort actions in cases where the parent had subsequently died, *Palcsey v. Tepper,* 71 *N.J.Super.* 294 (Law Div.1962), where the child had become emancipated, *Weinberg v. Underwood,* 101 *N.J.Super.* 448 (Law Div.1968), or where grandparents had acted *in loco parentis, Wilkins v. Kane,* 74 *N.J.Super.* 414 (Law Div.1962). *See France,* 56 *N.J.* at 504.

We further recognized in *France* that the reasons typically given for retaining immunity for parental negligence—the preservation of domestic harmony, the deterrence of fraud and collusion, and the protection of the family exchequer—had little remaining validity. *Id.* at 504–05. Echoing our analysis in the companion case of *Immer v. Risko,* 56 *N.J.* 482 (1970) (abolishing interspousal tort immunity in automobile negligence actions), we noted that the widespread use of liability insurance had virtually nullified the threat that parent-child tort actions had posed to domestic peace and intra-family finances. *France,* 56 *N.J.* at 505. We also expressed our confidence that our judicial system would expose most, if not all, of the collusive suits brought against insurance carriers by injured children and their parents. *Id.*

Although our specific holding in *France* was limited to the abolition of parental immunity in claims arising out of a parent's negligent operation of a motor vehicle, we nevertheless stated the general view that the immunity "should be abrogated in this State." *Id.* at 506. We further recognized as *dictum* that "there may be areas involving the exercise of parental authority and care over a child which should not be justiciable in a court

of law." *Id.* at 507. However, since those areas were not implicated in *France,* we did not decide "what limits, if any, the rule enunciated ... would have." *Id.*

Four years after *France,* we decided *Small v. Rockfeld,* 66 *N.J.* 231 (1974), in which we further cut back on the parental immunity doctrine. There, we allowed an infant to sue his father for the drowning of his mother, allegedly caused intentionally or "by conduct which was grossly negligent and in ... wanton, reckless disregard of [the mother's] safety and life." *Id.* at 233. In rejecting the defendant father's claim of immunity, we observed that the policy considerations of family disharmony and collusion that might otherwise justify his insulation from suit were insubstantial, given the mother's death. *Id.* at 247.

Our decision in *Small* clearly reaffirmed our general disapproval of the parental immunity doctrine in *France:*

> The reasoning and tenor of Justice Proctor's opinion in *France* ... leave no room for doubt that he and those who joined him considered the parental immunity to have been terminated in situations, such as the one at hand, where exercise of parental authority and adequacy of child care are admittedly not in issue. 56 *N.J.* at 504–07. [*Id.* at 244].

We concluded that "it is entirely evident that under the pertinent modern legal concepts the [child's action] ... should not have been barred at the threshold. And it is equally evident that the relevant policy considerations dictate the same conclusion." *Id.* at 246. However, we again recognized in *dictum,* as we did in *France,* that the immunity may remain operative in "special areas in the parent-child relationship, such as customary care and discipline." *Small,* 66 *N.J.* at 244. But since the issue of defining those "special areas" was likewise not before us in *Small,* we left that task to future case-by-case adjudication. *Id.*

As support for the retention of immunity in cases concerning the exercise of parental authority or customary child care, we cited in *France* and in *Small* the leading case of *Goller v. White,* 20 *Wis.*2d 402, 122 *N.W.*2d 193 (1963). In *Goller,* the Wisconsin

Supreme Court abolished the doctrine of parental immunity in all cases, except:

(1) where the alleged negligent act involves an exercise of parental authority over the child; and

(2) where the alleged negligent act involves an exercise of ordinary parental discretion with respect to the provision of food, clothing, housing, medical and dental services and other care. [*Id.* at 413, 122 *N.W.*2d at 198]

The *Goller* court did not define the limits of these exceptions. However, an analysis of subsequent Wisconsin court decisions reveals that the *Goller* exceptions in that state have been narrowly construed and do not apply to a parent's negligent failure to supervise or instruct a child on safety principles. *See, e.g., Howes v. Hansen,* 56 *Wis.*2d 247, 201 *N.W.*2d 825 (1972) (mother's negligent supervision not immunized where her child had been injured by another child operating a lawn mower); *Thoreson v. Milwaukee and Suburban Transp. Co.,* 56 *Wis.*2d 231, 201 *N.W.*2d 745 (1972) (parent's failure to supervise three year-old son, who became injured when he ran into busy street, held not exempted by *Goller*); *Cole v. Sears Roebuck & Co.,* 47 *Wis.*2d 629, 177 *N.W.*2d 866 (1970) (mother's negligent supervision of two year-old child injured while playing on a swing set held actionable). Some courts in other states, however, have held that suits for negligent supervision are immunized under the *Goller* exceptions. *See, e.g., Paige v. Bing Constr. Co.,* 61 *Mich.App.* 480, 233 *N.W.*2d 46 (1975) (parents' failure to caution child about dangers of construction site ruled within the domain of parental authority and thereby non-actionable); *Cherry v. Cherry,* 295 *Minn.* 93, 203 *N.W.*2d 352 (1972) (mother's conduct in leaving infant unattended, enabling infant to bite extension cord, held within *Goller* exception for acts of "ordinary parental discretion").

### III

Because this Court has never decided a case specifically on this issue, our lower courts have had to rely on what they perceive to be our philosophy concerning the doctrine of parental immunity in applying the *Goller* exceptions to cases involving

the exercise of parental authority and the provision of customary child care. The result has been confusion and several lower court opinions in direct conflict.

Since *Small,* there have been six reported decisions in our lower courts raising the issue of parental immunity. Two Appellate Division cases permitted a child's recovery where the parent's conduct was, at worst, merely negligent. *Dower v. Goldstein,* 143 *N.J.Super.* 418 (1976), rested mainly on legislative policy factors in permitting an unemancipated child bitten by the family dog to sue his parents under *N.J.S.A.* 4:19–16, a statute imposing strict liability. In *Gross v. Sears Roebuck & Co.,* 158 *N.J.Super.* 442 (1978), the Appellate Division found the *Goller* exceptions for parental authority and child-care matters inapplicable to a father's negligent operation of a lawn mower that resulted in his minor child's injury. Neither *Dower* nor *Gross,* however, involved the application of the *Goller* standards to a situation of negligent supervision.

Without question, our lower courts have had the greatest difficulty in resolving the issue of whether suits against a parent for negligent supervision fall within or without the *Goller* exceptions. *See generally* Note, "Negligent Supervision and Instruction Protected by Parent-Child Immunity," 13 *Seton Hall L.Rev.* 398 (1983). The reported cases have split evenly in determining whether negligent supervision actions are barred by the parental immunity doctrine.

On one hand, *Fritz v. Anderson,* 148 *N.J.Super.* 68 (Law Div.1977), and the Appellate Division's majority opinion below here, 182 *N.J.Super.* at 92–98, have held that matters of parental supervision are within the *Goller* exceptions and hence that no child may maintain an action against a parent on a theory of negligent supervision. In *Fritz,* parents of a minor child sued their neighbors on the child's behalf for injuries he sustained upon falling into an excavation in the neighbor's property. The defendants counterclaimed against the parents, alleging that they had negligently failed to supervise their child by permitting

him to wander unaccompanied in an area where construction had been in progress. In granting partial summary judgment to the parents, the trial court held that their inaction fell "within the realm of the exercise of parental authority and discretion" and therefore was protected by the doctrine of parental immunity. 148 *N.J.Super.* at 73. In the instant case involving the Foldis, the Appellate Division similarly held that mere negligent supervision of young Jennifer was not actionable and was barred by the doctrine of parental immunity. 182 *N.J.Super.* at 97–98.

On the other hand, Judge Furman, the dissenter in the Appellate Division in *Foldi,* reached a contrary result in a similar factual setting in *Convery v. Maczka,* 163 *N.J.Super.* 411 (Law Div.1978). In *Convery,* plaintiff, a five year-old, and his mother were visiting neighbors. The neighbors' children and the plaintiff were allowed to play unsupervised in the basement while their mothers conversed in the kitchen. After 15 minutes of unsupervised frolic, the plaintiff fell from a chair and fractured his arm. The court held that the child's claim against his mother for her negligent lack of supervision was not barred by the doctrine of parental immunity. In reaching that conclusion, Judge Furman noted that the mother had a general duty to exercise reasonable care to ensure her child's physical safety, a duty that implicated "[n]either the exercise of parental authority nor the adequacy of parental provision of necessaries." *Id.* at 417.

The analysis of *Convery* was followed in *Carey v. Davison,* 181 *N.J.Super.* 283 (Law Div.1981), a case decided a month before *Foldi.* There, an infant was holding her father's hand waiting to cross the street. After observing the traffic in the roadway, the father released his young daughter's hand and told her to cross. Upon doing so, she was struck by a car and seriously injured. The motorist filed a counterclaim against the father. The trial court in *Carey* recognized this Court's trend in abolishing the doctrine of parental immunity. *Id.* at 181 *N.J.Super.* at 285. Nevertheless, it felt compelled to hold that under present

law a claim of negligent supervision arising out of the parent-child relationship was inactionable. *Id.* at 290. However, it did not dismiss the counterclaim, but allowed it to be amended to make allegations comparable to those in *Convery,* alleging a breach of duty by one "with a special relationship to the child." *Id.* at 292.

The confusion in the state of our law on the applicability of parental immunity to negligent supervision cases is evident from our review of the preceding cases. In particular, the decisions in *Convery* and *Carey* are in direct conflict with *Fritz* and the majority opinion below. We now undertake the task of resolving that conflict, both for the disposition of the appeal before us and for the guidance of our lower courts.

## IV

We start from the fundamental principle that liability ordinarily should be imposed upon those who wrongfully injure others. Our laws have been fashioned to ensure that "a person should be compensated fairly for injuries caused by the violation of his legal rights." *Merenoff v. Merenoff, supra,* 76 *N.J.* at 547 (quoting *Carey v. Piphus,* 435 *U.S.* 247, 257, 98 *S.Ct.* 1042, 1049, 55 *L.Ed.*2d 252, 261 (1968)). Minor children are entitled to the same redress for wrongs done them as are any other persons. To justify a prohibition of the enforcement of their rights, a very substantial showing must be made that such prohibition will help achieve an important countervailing policy.

Through the years, the courts, for policy reasons, have conferred immunity on certain classes of defendants. However, it is evident that "there has been a steady movement away from immunity" in this State. *Willis v. Department of Conservation & Econ. Dev.,* 55 *N.J.* 534, 538 (1970). In the past three decades, we have judicially abrogated or restricted long-standing immunities in numerous areas of the law. *E.g., Merenoff v. Merenoff,* 76 *N.J.* 535 (1978) (interspousal tort immunity); *P.T. & L. Constr. Co. v. Commissioner, Dep't. of Transp.,* 55 *N.J.* 341 (1970)

(state governmental immunity); *Jackson v. Hankinson,* 51 *N.J.* 230, 234–35 (1968) (local governmental immunity); *Collopy v. Newark Eye & Ear Infirmary,* 27 *N.J.* 29 (1958) (charitable immunity). Notwithstanding this trend, immunities conferred by statute, of course, are and will continue to be recognized by our courts. *E.g., N.J.S.A.* 2A:53A–7, –8 (reinstating limited charitable immunity); *N.J.S.A.* 59:1–2 (sovereign immunity). Since we do not have such a legislative mandate on the issue of parental immunity, we are free here to weigh the competing policy interests implicated.

As we indicated *supra* at 536–38, the traditional arguments espoused in favor of intrafamily tort immunity were (1) the preservation of domestic harmony and (2) the deterrence of fraudulent or collusive suits against third-party insurers. We categorically rejected those arguments in *Immer* and *Merenoff* with respect to interspousal litigation and in *France* and *Small* with respect to children's claims against their parents. Given that history, we now reflect upon the following question: Do *any* valid reasons remain to justify the survival of even the present limited immunity for matters concerning the "exercise of parental authority and adequacy of child care?" *Small,* 66 *N.J.* at 244. We conclude that there are such reasons.

There are certain areas of activities within the family sphere involving parental discipline, care, and control that should and must remain free from judicial intrusion. Parents should be free to determine how the physical, moral, emotional, and intellectual growth of their children can best be promoted. That is both their duty and their privilege. Indeed, every parent has a unique philosophy of the rearing of children. That philosophy is an outgrowth of the parent's own economic, educational, cultural, ethical, and religious background, all of which affect the parent's judgment on how his or her children should be prepared for the responsibilities of adulthood. Such philosophical considerations come directly to the fore in matters of parental supervision.

There is no recognized correct theory on how much freedom a parent should allow his or her children. Some parents believe that a child must be made self-reliant at an early age and accordingly give their children a great deal of independence. To outsiders, such independence may look like indifference or neglect. On the other hand, some parents believe that their children must be vigilantly monitored from infancy through adolescence. To outsiders, such vigilance and concern may appear to shelter the children from the world and to thwart their development.

As each parent is different, so is each child. There is no one ideal "formula" for how much supervision a child should receive at a given age. What may be perfectly safe to entrust to one five year-old may be utterly dangerous in the hands of another child of the same age. This disparity often proves true even among siblings in the same household. The parent is clearly in the best position to know the limitations and capabilities of his or her own children. These intangibles cannot be adequately conveyed within the formal atmosphere of a courtroom. Nor do we believe that a court or a jury can evaluate these highly subjective factors without somehow supplanting the parent's own individual philosophy.

## V

These reasons justify the retention, to a certain extent, of the doctrine of parental immunity in the areas involving the exercise of parental authority or the provision of customary child care. Because there are so many varied situations involving these matters, we do not here determine what, if any, further refinements upon the doctrine may be required in each of these unique situations. We commend that undertaking to our lower courts to determine on a case-by-case basis.

We do, however, determine in the case before us the limits of parental immunity for one discrete area of parental authority—the absence or inadequacy of a parent's supervision

over his or her children. While the reasons set forth above are sufficient to justify the application of the doctrine of parental immunity to a parent's simple negligence in supervision, we do not believe these policies justify immunity for a parent's willful or wanton misconduct in supervising his or her child. Thus, we hold that while the doctrine of parental immunity is a bar to a suit alleging negligent supervision, it does not protect a parent who has willfully or wantonly failed to watch over his or her child. We think that this holding represents a reasonable compromise between two legitimate aims—a parent's right to raise, free of judicial interference, his or her child as he or she deems best, and a child's right to receive redress for wrongs done to him or her.

In reaching this new standard, we have considered and rejected the "reasonable parent" guideline adopted by the California Supreme Court in *Gibson v. Gibson, supra.* In *Gibson,* the doctrine of parental immunity was completely abolished. The California court directed the factfinders in each case to judge each defendant father or mother upon whether he or she acted as a reasonable parent under the circumstances. 3 *Cal.*3d at 921, 92 *Cal.Rptr.* at 293, 479 *P.*2d at 653. We fear that this instruction would result in jurors and judges substituting their own philosophy and standards of child-raising for those of the parent whose conduct is at issue. Further, we do not believe that parents should be routinely forced to defend the "reasonableness" of their child-rearing practices in a court of law, at least where their behavior does not rise to a level of wanton misconduct requiring public attention.

In addition, we can conceive of few accidental injuries a child might sustain that could not have been prevented by closer supervision by his or her parents. Hindsight invariably will expose some slight oversight, some failure to take yet another precaution that somehow contributed to the child's mishap. No parent can do everything. If such claims were allowed, it would be the rare parent who conceivably could not be called to account in the courts for his or her conduct. We also are not

unmindful of the current number of families severed by divorce. Suits for mere negligent lack of supervision could be used as a tool of harassment and retaliation by divorced parents. We hesitate to foster such litigation where no serious parental misconduct is at issue.

Alternatively, to permit the doctrine of parental immunity to bar completely an action against a parent by a child for substantial injuries resulting from his or her parent's willful or wanton lack of supervision is too unprotective of children and too unfair to third parties who may be less at fault. There is a point where parental neglect properly becomes a matter of public concern. Although New Jersey has criminal statutes that safeguard children from a parent's abuse, abandonment, cruelty, and neglect, *N.J.S.A.* 9:6–1 to –8.73, they apply and are enforced only in extreme cases and do not fully protect children from their parents' wanton carelessness. Liability for criminal neglect under *N.J.S.A.* 9:6–3 requires proof of intentional or purposeful conduct by the parent. *See State v. Burden,* 126 *N.J.Super.* 424 (App.Div.1974); *State v. Hofford,* 152 *N.J.Super.* 283, 296 (Law Div.1977). Were we to track the criminal statute and apply parental immunity to all but intentional torts, many serious cases of parental indifference would go undeterred and unredressed.

[3] In addition, the comparative fault of parents guilty of willful or wanton misconduct should be factored into the allocation of liability in cases involving third-party joint tortfeasors. Although it would perhaps be fairest to those third parties to consider the parent's contributory fault in all cases, we draw a line for policy reasons—as we do in offsetting damages in contributory negligence cases of less than 50%—that takes into account at least *some* of their interests. *See N.J.S.A.* 2A:15–5.1. *See also Draney v. Bachman,* 138 *N.J.Super.* 503 (Law Div.1976). Hence, we go further than the line of purely intentional torts by also removing willful or wanton supervisory misconduct from the protective boundary of immunity. Thus, third-party claims

may properly be brought against parents in appropriately severe lack-of-supervision cases.

## VI

Accordingly, we conclude that the doctrine of parental immunity will continue to preclude liability in cases of negligent supervision, but not for a parent's willful or wanton failure to supervise his or her children.

■ New Jersey has long recognized the distinction between willful or wanton conduct on the one hand and mere negligence on the other. *See, e.g., McLaughlin v. Rova Farms, Inc.,* 56 *N.J.* 288, 305–10 (1970); *Carney v. Gordon and Wilson Co.,* 153 *N.J.Super.* 109, 112–13 (App.Div.1977); *Iaconio v. D'Angelo,* 104 *N.J.L.* 506, 508 (E. & A. 1928); *Staub v. Public Serv. Ry. Co.,* 97 *N.J.L.* 297, 299–300 (E. & A. 1922). And unlike an intentional tort, "wanton or willful misconduct does not require the establishment of a positive intent to injure." *Tabor v. O'Grady,* 61 *N.J.Super.* 446, 451 (App.Div.1960). The standard is thus an accepted intermediary position between simple negligence and the intentional infliction of harm. *See Prosser, supra,* § 34 at 184–86.

Although, as we stated in *McLaughlin, supra,* "[i]t is not easy to set down a readily usable definition of willful [or] wanton misconduct," 56 *N.J.* at 305, we have generally expressed the concept as follows:

> it must appear that the defendant with knowledge of existing conditions, and conscious from such knowledge that injury will likely or probably result from his conduct, and with reckless indifference to the consequences, consciously and intentionally does some wrongful act or omits to discharge some duty which produces the injurious result.

> \*     \*     \*     \*     \*     \*     \*     \*

> [W]illful [or] wanton misconduct signifies something less than an intention to hurt. To establish that condition it is not necessary that the defendant himself recognize his conduct as being extremely dangerous; it is enough that he know, or has reason to know, of circumstances which would bring home to the

realization of the ordinary reasonable man the highly dangerous character of his conduct. [*McLaughlin*, 56 *N.J.* at 305–06]

*Accord Staub v. Public Serv. Ry. Co., supra,* 97 *N.J.L.* at 300.

Several other jurisdictions have adopted a similar principle and abolished the doctrine of parental immunity in tort actions that involve a parent's willful or wanton misconduct. *E.g., Dennis v. Walker,* 284 *F.Supp.* 413 (D.D.C.1968); *Attwood v. Estate of Attwood,* 276 *Ark.* 230, 633 *S.W.2d* 366 (1982); *Horton v. Reaves,* 186 *Col.* 149, 526 *P.2d* 304 (1974); *Illinois Nat'l Bank and Trust Co. v. Turner,* 83 *Ill.App.3d* 234, 38 *Ill.Dec.* 652, 403 *N.E.2d* 1256 (1980); *Cowgill v. Boock,* 189 *Or.* 282, 218 *P.2d* 445 (1950); *Groves v. Groves,* 152 *W.Va.* 1, 158 *S.E.2d* 710 (1967).

Further, our adoption of the willful or wanton standard as the liability threshold in parental supervision cases is consistent with our decision in *Merenoff* to retain interspousal immunity for acts of "simple domestic carelessness." 76 *N.J.* at 555. We believe that child supervision falls within the realm of "activities which partake of the everyday exigencies of regular household existence," that we exempted from simple negligence liability in *Merenoff. Id.* Only where the supervision, or lack thereof, rises to the level of willful or wanton misconduct should the judicial process be invoked.

## VII

█ Turning to this case, we must determine whether Mrs. Foldi's lack of supervision, as stipulated in the facts, might constitute willful or wanton misconduct or merely negligence. Since "differences in gravity of fault cannot be stated with mathematical precision," the focus must be on the "seriousness of the actor's misconduct." *McLaughlin, supra,* 56 *N.J.* at 305–06. This case was determined on defendants' motion for summary judgment. *R.* 4:46. Here, the undisputed facts show that Mrs. Foldi was, at worst, merely negligent. The amount of her inattention to her daughter was slight. There is no evidence to show she was recklessly or consciously indifferent to Jennifer's welfare. Jennifer was out of her mother's sight only for a

total period of 10 minutes. She and her mother were together in their own yard. There is no evidence that Mrs. Foldi would have perceived a high probability of injury to Jennifer there. This case represents a typical instance of a negligent lack of supervision, where a parent briefly loses sight of his or her child. Our result might be different if they had been standing at a railroad track.

We do not believe that parents in cases such as this one should have to bear the burden of defending their conduct at a trial. Summary judgment was properly granted in Mrs. Foldi's favor, there being no genuine issue of fact as to her willful or wanton misconduct. *R.* 4:46–2.

## VIII

Thus, we reaffirm today our decisions in *France* and *Small* and hold that the doctrine of parent-child immunity is abrogated, except in special situations that involve the exercise of parental authority and customary child care. We further modify that exception in the context of an alleged failure of parental supervision and permit recovery where the parent's inadequate supervision rises to the level of willful or wanton misconduct. However, we leave to future consideration whether parental immunity should be similarly limited in other areas of parental authority and child care not involving supervision.

Because the plaintiff's mother in the case before us did not willfully or wantonly fail in her duty to supervise her child, we accordingly affirm the judgment of the Appellate Division.

*For affirmance*—Chief Justice WILENTZ and Justices SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—6.

*For reversal*—None.