[No. 7131–6–III.   Division Three.   November 13, 1986.]

DAVID W. CONRADT, ET AL, *Appellants,* v. FOUR
STAR PROMOTIONS, INC., ET AL,
*Respondents.*

*William J. Connor* and *Horton, Wilkins & Faurholt,* for appellants.

*Michael L. O'Donnell* and *Raekes, Rettig, Osborne, Forgette & O'Donnell,* for respondents.

THOMPSON, J.—David W. and Cheryl Conradt appeal the summary judgment dismissal of their personal injury and consortium claims. We affirm.

On July 4, 1982, David Conradt was injured participating in a demolition race at the Richland Tri-City Raceways, operated by Four Star Promotions, Inc. On January 24, 1984, the Conradts filed a personal injury complaint against Four Star and others, which was later amended to include, *inter alia,* a claim for Mrs. Conradt's loss of consortium. The trial court granted Four Star's motion for summary judgment and the Conradts appeal. The issues revolve around the effect of a printed release of liability form purportedly signed by Mr. Conradt prior to a change in the direction of the race.

The first issue is whether the court should have ruled on summary judgment that Mr. Conradt signed the release form. The purpose of a summary judgment is to avoid a useless trial where there is no genuine issue of material fact. On review we must determine whether the affidavits, facts, and record have created such an issue of fact material to the cause of action. *Seven Gables Corp. v. MGM/UA Entertainment Co.,* 106 Wn.2d 1, 12, 721 P.2d 1 (1986); *Hewitt v. Miller,* 11 Wn. App. 72, 74, 521 P.2d 244 (1974). Moreover, the burden is on the adverse party. *Seven Gables,* at 13.

In granting the motion as it pertained to Four Star's contention Mr. Conradt signed the release, the trial court noted:

Now, I'm not about to accept the proposition there's an issue of fact whether or not there's a release signed the

year before. There's no facts that would lead to that conclusion. It's totally speculation and it defies the imagination, in fact, to suggest that this one signed by some 75 people was all signed a year before. Well, not only that, but it could be perjury and fraud and a few other things for the defendant to come in with a release that was signed the year before—that would be uncovered about as fast as anything I would think of.

Mr. Conradt testified that although he did not specifically recall signing anything that day, "it was my custom to sign in and I may have done so on the day in question". Moreover, his son, Danny Conradt, testified:

When I signed in, I was instructed to do just that, sign in. Nobody ever told me that I was signing any type of an agreement.

That after signing in, I attended the pit meeting before the race.

The first page of the release form itself, dated July 4, 1982, contained the signature of David Conradt on the lowermost righthand line, followed by the designation of car number 47. The following page was a copy of the same form on which the list of names continued from the upper left line with Dan Conradt, Wayne Walden, and Dave Conradt, all designating car number 47.

Although Mr. Conradt points out the fact the one witness who observed him sign the release mistakenly recalled him driving a "Sunkist" vehicle which he actually drove on a prior occasion, he admits the signature on the form, accompanied by those of his pit crew, appeared to be his. Absent a more unequivocal denial, Mr. Conradt did not meet his burden under these facts.

The second issue is whether the questions raised by Mr. Conradt involving the conspicuous nature of the release and the material change in risk after the release was executed should have been disposed of on summary judgment. Contracts against liability for negligence are valid unless releasing language is so inconspicuous reasonable persons could reach different conclusions as to whether the document was unwittingly signed, *Baker v. Seattle,* 79 Wn.2d

198, 200, 484 P.2d 405 (1971); *Hewitt,* at 78.

The document at issue here, entitled "Voluntary Waiver and Release from Liability and Indemnity Agreement" was addressed entirely to the obvious and inherent risks and danger in racing, the voluntary assumption of those risks, and the waiver and release of the promoters and others from liability, with boldface emphasis throughout. Additionally, above each signature line on the lower portion of the form was printed the conspicuous statement "I have read this release." Even if we accept Mr. Conradt's argument the form was on a clipboard and partially covered by other materials, the admonition to read the release form above each signature line on the lower section of the form could not reasonably have escaped his notice.

Mr. Conradt further argues that after he signed the form, the risk was materially altered by the change in direction of the race. However, he admits past demolition races were run both clockwise and counterclockwise and he had previously competed in both directions. When asked if he was concerned about the change in direction, Mr. Conradt replied:

> A Oh, I had concerns about the directions. I knew that I wouldn't be able to corner as well, but I knew this as soon as he had told me. And since I had run that direction before, I felt that I would take it easy and be able to handle it. I knew it was risky, but I didn't know how risky.
>
> Q You were willing to take the risk, though, rather than pull off to the side is what I'm asking?
>
> A Yes.
>
> Q Pardon?
>
> A Yes. Yes.

Under these circumstances, the risk was inherent in the nature of the activity regardless of which direction the cars were running, and no issue of fact exists as to Mr. Conradt's contemplation of the risk involved.

Another related issue involves the propriety of summary judgment concerning whose liability was to be waived. Mr. Conradt underscores testimony from one of the

defendants to the effect the release applied to the negligence of other drivers, and not the operators and owners of the race track. But the express language of the release is not restricted to just participants:

2. . . . the speedway, fairgrounds, or raceway, the Promoters, Participants, Sanctioning Organization, Racing Association, Track Operators, Track Owners, Landowners, each and every other person who signs this release or any identical release form during the effective period of this release, and all officers, directors, agents or employees of any of the foregoing specified entities.

We find no question exists as to an intent to limit the waiver to negligence of other drivers. The unambiguous, all–inclusive language of the release controls.

The Conradts next argue summary judgment was not proper because of a question of fact concerning the failure of the release on its own terms. The portion of the release relevant to this issue provided:

3. This speedway and premises onto which he is about to enter is not a place of amusement or recreation, but instead is a professional forum in which the undersigned can profit from prize money, publicity, advertising exposure, employment and other such rewards and remunerations, and each of the undersigned further agrees to execute this release in consideration of being allowed to enter the restricted area and enjoy such profits, employment, rewards and remunerations.

Mr. Conradt argues a lack of professionalism and failure to provide remuneration constituted a breach of the release agreement, making it unenforceable. Although the affidavit of Joe Bonner, a former Tri–City Raceways promoter, stated he discontinued running clockwise races for safety reasons, a showing of increased risk does not necessarily mean the racing forum was not "professional." As to lack of remuneration, promotional exposure alone will suffice. But the potential for financial remuneration was also present, since the event was advertised July 1, 1982, as offering $1,000 to win, $300 for second place, and $200 for third place. We find Mr. Conradt's arguments on the issue

unpersuasive.

We are next asked to determine whether the release was invalid based on the gross negligence of Four Star. In addition to the previously discussed "inconspicuous" basis for invalidating contracts waiving liability for negligence, another exception exists "where the negligent act falls greatly below the standard established by law for the protection of others against unreasonable risk of harm." *Blide v. Rainier Mountaineering, Inc.*, 30 Wn. App. 571, 574, 636 P.2d 492 (1981) (citing *McCutcheon v. United Homes Corp.*, 79 Wn.2d 443, 486 P.2d 1093 (1971); *Hewitt*, at 77 n.1).

Gross negligence is negligence substantially and appreciably greater than ordinary negligence. *Spencer v. King Cy.*, 39 Wn. App. 201, 206, 692 P.2d 874 (1984) (quoting *Nist v. Tudor*, 67 Wn.2d 322, 331, 407 P.2d 798 (1965)). Willful or wanton misconduct falls between simple negligence and an intentional tort and is sufficient where an actor "'know[s], or has reason to know, of circumstances which would bring home to the realization of the ordinary reasonable [person] the highly dangerous character of his conduct.'" *Jenkins v. Snohomish Cy. PUD 1*, 105 Wn.2d 99, 106, 713 P.2d 79 (1986) (quoting *Foldi v. Jeffries*, 93 N.J. 533, 549–50, 461 A.2d 1145 (1983)). Given the facts in this case that are undisputed, the conduct was not so substantially and appreciably substandard that it rendered the release invalid.

Finally, we address whether Mrs. Conradt's claim for loss of consortium was valid despite language in the release purporting to bind her. A portion of the release stated:

> In consideration of being permitted to enter upon and use for any purpose the restricted area (defined below) and for other good and valuable consideration stated herein, by reading and signed below each of the undersigned for himself and personal representatives, assigns, heirs and next of kin, hereby agrees:

Loss of consortium involves the ""loss of love, affection, care, services, companionship, society and consor-

tium . . .""" suffered by the "deprived" spouse as a result of a tort committed against the "impaired" spouse. *Lund v. Caple,* 100 Wn.2d 739, 744, 675 P.2d 226 (1984) (quoting *Lundgren v. Whitney's Inc.,* 94 Wn.2d 91, 94, 614 P.2d 1272 (1980)). No claim for loss of consortium will arise if no tort is committed against the impaired spouse. Here, the injured husband, by signing the release, entered into a contract expressly agreeing to participate in an undertaking posing known risk. He assumed the risk and evidenced that assumption by signing the release. The husband thus previously abandoned the right to complain if an accident occurred. 57 Am. Jur. 2d *Negligence* § 276, at 667 (1971). There can be no actionable negligence where no duty was owed to the person injured. 57 Am. Jur. 2d *Negligence* § 277, at 668. Even though loss of consortium has been held a separate, independent, nonderivative action of the deprived spouse and not affected by the negligence of the impaired spouse, *Christie v. Maxwell,* 40 Wn. App. 40, 44, 696 P.2d 1256, *review denied,* 104 Wn. 2d 1002 (1985), nevertheless, an element of this cause of action is the "tort committed against the 'impaired' spouse". *Lund,* at 744. Moreover, a consortium claim by a lone spouse will not be recognized where the underlying tort has been prohibited or abolished. *Lund,* at 747.

Here, because of the release, no cause of action arose from which a court could conclude a tort had been committed upon Mr. Conradt. Therefore, an element of the consortium claim was lacking and summary judgment dismissal was proper.

Affirmed.

GREEN, C.J., and MUNSON, J., concur.

MUNSON, J. (concurring)—While I agree with the majority, I would go further on the issue of the spouse's right to bring an action for loss of consortium when the other spouse's injury results from participating in professional sports. While *Christie v. Maxwell,* 40 Wn. App. 40, 696

P.2d 1256, *review denied,* 104 Wn.2d 1002 (1985) is presently the law, I would hold as a matter of public policy that for spouses of those who participate in professional sports, be it major sports of auto racing, baseball, basketball, football, hockey, horse racing, soccer, or any other professional sport where physical contact does occur, there is no cause of action for loss of consortium.

This would result whether the "offended" spouse agreed or disagreed with the other spouse's participation. This would have to be particularly true in a demolition derby where the object of the sport is to be the surviving car and driver and one attains that end by driving into other vehicles. While reasoning logically from the language of *Christie,* such an action as this may be maintainable, I find it incomprehensible that society is ready to countenance such actions.